# Exhibit A

1  SCUDI JOHNSON & AYERS, LLP
   Morgan J.C. Scudi (# 147942)
2  A. Melissa Johnson (#187441)
   5440 Morehouse Drive, Suite 4400
3  San Diego, CA 92121
   (858) 558-1001
4
   Attorneys for Plaintiffs
5

6

7                    UNITED STATES DISTRICT COURT

8                   SOUTHERN DISTRICT OF CALIFORNIA

9

10
   STEVEN CAMPBELL, an individual;      )   **CASE NO. 10-CV-1821-JM-POR**
11 and CARLOTA FRANKLIN-               )
   CAMPBELL, an individual.             )   **FIRST AMENDED COMPLAINT FOR:**
12                                       )
                 Plaintiffs,            )   **(1)   Negligence- Failure to Warn**
13                                       )   **(2)   Negligence - Unsafe Operation**
   v.                                    )   **(3)   Strict Product Liability - Design**
14                                       )   **      Defect**
   WILLIAM LOGUE, an individual and as  )   **(4)   Strict Product Liability - Failure to**
15 a Trustee for The Sears/Logue Revocable )   **      Warn**
   Trust ; THE SEARS/LOGUE             )   **(5)   Loss of Consortium**
16 REVOCABLE TRUST; DAVID              )
   MARQUEZ, an individual;  MIKELSON   )
17 YACHTS, INC., a California           )
   Corporation; BLUEWATER YACHT        )   Judge: Jeffrey T. Miller
18 BUILDERS, LTD., a Foreign           )   Ctrm.  16
   Corporation; YA PLASTICS            )
19 CORPORATION, a Foreign Corporation; )
   and NAN YA PLASTICS                 )
20 CORPORATION, a Delaware             )
   Corporation                         )
21                                       )
                 Defendants.            )
22                                       )
   ─────────────────────────────────    )
23 AND RELATED CROSS-ACTIONS.          )
                                        )
24
25      COME NOW Plaintiffs STEVEN CAMPBELL and CARLOTA FRANKLIN-CAMPBELL,

26 by and through their attorneys, Scudi Johnson & Ayers, LLP and hereby allege:

27      1.    This court has jurisdiction pursuant to 28 U.S. § 1333 as it arises within the

28 Admiralty or Maritime jurisdiction of this court.

                                        1

1    2.    Venue is appropriate because Defendants WILLIAM LOGUE ("Logue"), THE

2  SEARS/LOGUE REVOCABLE TRUST, and MIKELSON YACHTS, INC. ("Mikelson Yachts"),

3  are residents of San Diego County, California, in this judicial district.

4    3.    Defendant DAVID MARQUEZ ("Marquez" and/or "Captain") is, upon information

5  and belief, a resident of Mexico and an employee of Logue and/or the Sears/Logue Revocable Trust.

6    4.    Plaintiffs STEVEN CAMPBELL and CARLOTA FRANKLIN-CAMPBELL are,

7  and at all times relevant to this complaint were, citizens and residents of San Diego County,

8  California.

9    5.    MIKELSON YACHTS, INC., is a California corporation with its principal place of

10  business in San Diego County, California.

11    6.    Upon information and belief, BLUEWATER YACHT BUILDERS, LTD.

12  ("Bluewater") is a Taiwanese Corporation which manufactures vessels for Mikelson Yachts,

13  including but not limited to the "Andale," the vessel at issue in this action.

14    **STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION**

15    7.    In or about December 7, 2008, Plaintiff Steven Campbell was injured aboard the

16  "Andale," a 2007 Model, 57 foot Mikelson Luxury Sports Fisher, while the Andale was operating

17  in International waters off the southern tip of Baja California.

18    8.    Upon information and belief, the Andale is a documented U.S. vessel, owned by

19  Defendant Logue as Trustee for The Sears/Logue Revocable Trust at the time in question. Upon

20  information and belief, the vessel was been sold to a third party buyer sometime in 2011.

21    9.    Upon information and belief, during the time period the vessel was owned by

22  Defendant Logue, the Andale often operated as a charter boat in Cabo San Lucas, Mexico. The

23  Andale was captained by Defendant David Marquez (hereinafer "Captain"), with his son Andy

24  Marquez acting as deckhand and mate (hereinafer "Mate") for sports fishing.

25    10.    The Andale is designed and rigged for fishing on its fore and aft decks; the fore deck

26  has a bait tank, railings, and a pulpit for casting. The aft deck, or cockpit, is also fitted with bait

27  tanks, is utilized for cast fishing or trolling, and has a fighting chair in the center of a cockpit.

28  ///

2

11.    On December 7, 2008, Defendant David Marquez, under the direction and control of Logue, captained the Andale. The Andale was at sea while Plaintiff Steven Campbell, Robert Garavello, and Defendant Logue fished for marlin.   Andy Marquez was also onboard as mate/deckhand.

12.    Plaintiff Campbell went to the foredeck to fish, which was a common practice for him and others on the Andale. Defendant Marquez was operating the Andale too aggressively for him to fish from the foredeck, and he so informed Logue after he came back to the aft portion of the vessel. Logue responded that he would have Marquez put the Andale in a controlled drift so that Campbell could fish from the foredeck, while Logue assisted Garavello in cast fishing from the aft deck. Defendant David Marquez called out that he had spotted marlin off the bow of the Andale. With the Andale put into a controlled drift, Campbell and the mate, Andy Marquez, again went to the fore deck and began casting for marlin.

13.    Plaintiff Campell lost the bait on his initial cast, and the mate handed another rod to Campbell for casting. The marlin were located on the starboard side of the Andale, and so Plaintiff Campbell began to move aft down the starboard side of the foredeck. He was reaching for the railing on the starboard side of the foredeck when, without warning, the Andale went underway aggressively, knocking Campbell down. The facts that 1) the deck was unreasonably slippery, lacking a proper non-skid surface, and 2) the railing along the deck was too low, contributed to the fall and the severity of Campbell's injuries.

14.    Plaintiff Campbell landed on his left hip, hit his head, and was unable to rise. Campbell was in great pain and unable to use his legs. The Andale was stopped, and the Andy Marquez, Garavello, and Logue came to Campbell's assistance and slid Campbell to the cockpit and carried him into the salon. The severity of his injuries dictated that the Andale head directly back to port at Cabo San Lucas. The ship-to-shore radio was used to notify Mrs. Campbell of the accident, and to seek medical care.

15.    At port, the Captain was heard to say he gave Campbell a vacation, and has subsequently stated, when asked why he put the Andale underway with Campbell on the fore deck, that Mr. Logue told him to do so.

3

16.    Neither the Captain, nor Logue made any effort to warn Campbell and the Mate of their decision to put the Andale underway.

17.    Following the injury at sea, Campbell was in tremendous pain, suffered from a hematoma and a broken pelvis, and he spent the next hours heading to port without pain medication.

18.    At port, two Blue Med technicians met the Andale, but the ambulance was parked blocks away. Campbell, unable to walk and in great pain, had to be carried through the docks and up the walkways of a busy port.

19.    At the Blue Med Care facility, Campbell was examined by a Mexican physician, x-rayed, and told that he had a broken pelvis. The physician stated that Mr. Campbell needed an operation, but that they had no blood for him if they operated in Cabo. It was recommended that, if he could afford it, he should be flown back to San Diego for hospital care.

20.    Mrs. Campbell arranged a for a Medi-VAC evacuation by plane to take Campbell to Scripps Hospital in San Diego on the morning of December 8, 2008. Campbell spent the rest of the night at the Blue Med Care facility in Cabo San Lucas. On December 8, 2008, Campbell, two technicians, and Garavello flew to Brown Field in San Diego by Lear jet, where Campbell was taken by ambulance to Scripps Memorial and admitted. Campbell's injuries were extensive.

21.    Upon arrival in San Diego, Campbell was admitted to Scripps Memorial Hospital on December 8, 2008. On December 10, 2008, Plaintiff Campbell had surgery to repair a complex left acetabular fracture of his pelvis. Eight days later, on December 18, 2008, while still in recovery, Campbell developed confusion, loss of awareness, decreased mentation, and was noted to have a huge right side subdural hematoma. Campbell underwent surgery, and the subdural hematoma was drained by temporarily removing a portion of Campbell's skull

22.    Campbell's skull subsequently became infected, and the bone that had been replaced in the previous operation, was removed permanently in a further operation. Campbell was put on a strict antibiotic regimen under which he received daily injections at the hospital for six weeks, and he wore a protective helmet for months because a portion of his skull was missing. Once the bone infection was treated, Campbell underwent a fourth operation on June 23, 2009, in which a permanent plastic plate was inserted in his head to replace the missing skull. Campbell continued

4

1   physical therapy for his pelvis.

2       23.     In short, Campbell arrived in San Diego with four (4) breaks to his pelvis and a

3   hematoma that continued to bleed.  He spent weeks in intensive care, two months at Scripps La

4   Jolla Hospital, and one month at Scripps rehabilitation facility in Encinitas, California.  He had four

5   surgeries; the last surgery was on June 23, 2009, to insert a plastic plate in his skull.  He was cleared

6   by the orthopedic surgeon on May 3, 2010.

7   **FIRST CAUSE OF ACTION**

8   **(Negligence-Unsafe Condition Against Defendants Logue, The Sears/Logue Revocable Trust, and**

9   **David Marquez)**

10      24.     Plaintiffs refer to and incorporate by this reference paragraphs 1 through 23

11  inclusive, as though fully set forth herein.

12      24.     Defendants had a duty to warn Campbell of any unsafe or defective condition on the

13  Andale.

14      25.     Defendants failed to do so and breached their duty to warn Campbell of the

15  unreasonably slippery condition of the Andale's foredeck and the fact that the foredeck's railing was

16  unreasonably low.  Campbell fell on his hip and hit his head while fishing from the foredeck in a

17  normal, reasonable and expected manner.  But for the unreasonably slippery condition of the

18  foredeck and the unreasonably low railing, and Defendants failure to warn of this unsafe condition

19  on the foredeck, Plaintiff Campbell would not have fallen and would not have suffered sever

20  injuries.

21      26.     Defendants are liable for the damages for proximately caused by their breach of duty.

22   Campbell was acting within the scope of his invitation, as an invitee of Logue on the Andale, and

23  was on the foredeck cast fishing at a location fitted with a bait tank for that purpose.  Logue had the

24  Andale put into a controlled drift so that Campbell could fish from the foredeck.  Defendants knew

25  where Campbell was, and told Campbell specifically that the Andale would be in a controlled drift

26  so he could fish from the bow.

27      27.     Defendants breach of duty proximately caused the injuries to Campbell in an amount

28  to be proven at time of trial.

5

## SECOND CAUSE OF ACTION

**(Negligence-Unsafe Operation of Vessel Against Defendants Logue, The Sears/Logue Revocable Trust, and David Marquez)**

28.    Plaintiffs refer to and incorporate by this reference paragraphs 1 through 27 inclusive, as though fully set forth herein.

29.    Defendants owed a duty of care to Campbell to operate the Andale in a safe manner.

30.    Defendants failed and breached their duty to Campbell by failing to operate the Andale in a safe manner.  Campbell and the Mate were fishing from the foredeck during a controlled drift, when under the direction of Logue, the Captain put the Andale in gear.  The Captain caused the Andale suddenly to go forward and knocked Campbell from his feet and causing him to land on his hip and hit his head on the deck.

31.    Defendants are liable for the damages proximately caused by their breach of duty. Campbell was acting within the scope of his invitation, as an invitee of Logue on the Andale, and was on the foredeck cast fishing at a location fitted with a bait tank for that purpose.  Logue had the Andale put in a controlled drift so Campbell could fish where he did.  Defendants knew where Campbell was, and told Campbell specifically that the Andale would be in a controlled drift so he could fish from the bow.

32.    Defendants had a duty to maintain a lookout be aware of all passengers before putting the vessel into gear and maneuvering the vessel.  Logue and the Captain had a duty to warn Plaintiff Campbell that they were about to put the boat underway, and allow him time to secure himself and prevent injury such as those suffered by Plaintiff.  That failure, coupled with putting the Andale into gear, proximately caused the injuries to Campbell in an amount to be proven at time of trial.

## SECOND CAUSE OF ACTION

**(Strict Product Liability - Design Defect against Mikelson Yachts, Inc. and Bluewater Yacht Builders, Ltd.)**

33.    Plaintiffs refer to and incorporate by this reference paragraphs 1 through 32 inclusive, as though fully set forth herein.

///

6

1    34.    The Andale, a 57 foot Mikelson luxury sports fisher, was specifically designed by

2  Defendant Mikelson Yachts for long range sports fishing. The Andale was rigged with bait tanks

3  fore and aft, specifically for cast fishing from the fore and aft decks.

4    35.    Upon information and belief, the Andale was manufactured by Bluewater at the

5  direction of Mikelson Yachts, including the design of the foredeck and its surface, along with bait

6  tanks for cast fishing.

7    36.    Defendant Mikelson Yachts and Bluewater together designed and manufactured the

8  Andale to Logue' specifications and at his specific instruction, and Mikelson subsequently

9  distributed and sold the Andale to Logue.

10    37.    It was foreseeable that the foredeck would be used for cast fishing and, indeed the

11  vessel was designed such that persons can fish from the foredeck. Mikelson Yachts specifically

12  states in its brochures that ,"deck areas are wide and accessible, with nice looking and functional

13  slip-proof and rails where they need to be."

14    38.    The "slip-proof" surface utilized by Mikelson Yachts and Bluewater was, upon

15  information and belief, improperly selected, designed and manufactured and was defective for the

16  purpose for which it was intended in that it was unreasonably slippery during normal and expected

17  use. Likewise, the foredeck's railing was, upon information and belief, improperly selected,

18  designed and manufactured and was defective for the purpose for which it was intended in that it

19  was unreasonably low for normal and expected use

20    39.    Due to the failure of the supposed non-skid surfaces on the foredeck to actually

21  perform the function for which it was intended and unreasonably low railings, the Andale was not

22  safe for fishing as the ordinary user would expect because the foredeck's surface was unreasonably

23  slippery and the railing unreasonably low.

24    40.    On December 7, 2008, while Plaintiff was aboard the Andale and fishing from the

25  foredeck, he fell on his hip and hit his head. But for the unreasonably slippery and defective

26  foredeck surface and unreasonably low railing, Plaintiff would not have fallen. The defective

27  foredeck surface and railing were proximate causes of the injuries to Plaintiff.

28  ///

7

41.     Plaintiff Steven Campbell suffered damages caused by the defective foredeck and railing in the form of lost income, medical expenses, and pain and suffering in an amount to be proven at time of trial.

## FOURTH CAUSE OF ACTION

**(Strict Product Liability - Failure to Warn Against Mikelson Yachts, Inc. and Bluewater Yacht Builders, Ltd.)**

42.     Plaintiff refers to and incorporates by this reference paragraphs 1 through 41 inclusive, as though fully set forth herein.

43.     The Andale, a 57 foot Mikelson Yachts luxury sports fisher, was specifically designed by Mikelson Yachts for long range sports fishing. The Andale was rigged with bait tanks fore and aft, specifically for cast fishing from the fore and aft decks.

44.     Upon information and belief, the Andale was manufactured by Bluewater at the direction of Mikelson Yachts, including the design of the foredeck and its surface and railings, along with bait tanks for cast fishing.

45.     Defendant Mikelson Yachts and Bluewater together designed and manufactured the Andale to Logue' specifications and at his specific instruction, and Mikelson subsequently distributed and sold the Andale to Logue.

46.     It was foreseeable that the foredeck would be used for cast fishing and Mikelson Yachts specifically states in brochures that," deck areas are wide and accessible, with nice looking and functional slip-proof and rails where they need to be."

47.     The "slip-proof" surface utilized by Mikelson Yachts was, upon information and belief manufactured by Bluewater Yacht Builders, Ltd. The "slip-proof" surface utilized by Mikelson Yachts and Bluewater was, upon information and belief, improperly selected, designed and manufactured and was defective for the purpose for which it was intended in that it was unreasonably slippery during normal and foreseeable use. Likewise, the foredeck's railing was, upon information and belief, improperly selected, designed and manufactured and was defective for the purpose for which it was intended in that it was unreasonably low for normal and expected use.

///

///

8

48. It was foreseeable that the vessel would be in motion when persons were walking on the foredeck's surface while the Andale was being utilized for fishing. Therefore the Andale had the potential to cause injury. This fact was known or should have been known by Mikelson Yachts and Bluewater Yacht Builders, Ltd. at the time of manufacture, distribution and sale.

49. Due to the failure of the non-skid surfaces and railings on the decks to actually perform their designated function, the Andale was not as safe as the ordinary user would expect. The potential risks of not having a properly functioning non-skid surface and railings on the foredeck presented a substantial danger to persons aboard the Andale.

50. The ordinary user would not have recognized the potential risks caused by a defective foredeck surface and railings.

51. Mikelson Yachts and Bluewater Yacht Builders, Ltd. failed to adequately warn or instruct regarding the potential risks caused by the unreasonably slippery foredeck and unreasonably low railings.

52. On December 7, 2008, while Plaintiff was aboard the Andale and fishing from the foredeck, Plaintiff fell and was injured as he was fishing from the foredeck of the Andale in a location which was intended for fishing. But for the failure of Mikelson Yachts and Bluewater Yacht Builders to warn of the defective condition of the foredeck surface and railings, Plaintiff would not have been injured.

53. The lack of sufficient warning or instruction was a proximate cause and substantial factor in Plaintiff's resulting injuries. Plaintiff suffered substantial damages in the form of lost income, medical expenses, and pain and suffering, in an amount to be proven at time of trial.

## FOURTH CAUSE OF ACTION

### (Loss of Consortium Against All Defendants)

54. Plaintiffs refer to and incorporate paragraphs 1 through 53 inclusive, as though fully set forth herein.

55. Plaintiff Carlota Campbell is, and at all times relevant to this action was, married to Plaintiff Steve Campbell and lost the care, comfort and consortium of her husband as a result of his injuries. Said injuries were caused by the actions of Defendants, as stated herein.

9

FIRST AMENDED COMPLAINT

1

2   **WHEREFORE**, Plaintiffs pray for relief as follows:

3       1.      For past and future general damages in an amount to be proven at trial;

4       2.      For special damages in an amount to be proven at trial;

5       3.      For consequential damages in an mount to be proven at trial;

6       4.      For reasonable costs and attorneys' fees; and

7       5.      For such other relief as this Court may deem just and proper.

8

9   Dated ____ July 20, 2011 ____              **SCUDI JOHNSON & AYERS, LLP**

10

11                                     By:      s/ J. Ray Ayers
                                              Morgan J.C. Scudi
12                                            J. Ray Ayers
                                              Attorney for Plaintiffs
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

1    SCUDI JOHNSON & AYERS, LLP
     Morgan J.C. Scudi  (# 147942)
2    J. Ray Ayers (#217706)
     5440 Morehouse Drive, Suite 4400
3    San Diego, CA 92121
     (858) 558-1001

4

     Attorneys for Plaintiffs

5

6

7

8
                     UNITED STATES DISTRICT COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   STEVEN CAMPBELL, an individual; and CARLOTA FRANKLIN-CAMPBELL, an individual. | ) ) )    **CASE NO. 10-CV-1821-JM-POR** |
| 12 | ) |
| 13             Plaintiffs, | )    **PROOF OF SERVICE** |
| 14   v. | ) ) |
| 15   WILLIAM LOGUE, an individual and as a Trustee for The Sears/Logue Revocable Trust ; THE SEARS/LOGUE REVOCABLE TRUST; | ) ) ) |
| 16   DAVID MARQUEZ, an individual; and MIKELSON YACHTS, INC., a California | ) ) |
| 17   Corporation; NAN YA PLASTICS CORPORATION, a Foreign Corporation; and | ) ) |
| 18   NAN YA PLASTICS CORPORATION, a Delaware Corporation. | ) ) |
| 19 | ) ) |
| 20             Defendants. | ) ) |

21

22

23

24

25

26

27

28

1   I, Shurron Smith, declare as follows: I am employed in the County of San Diego, California,

2   in which county the within-mentioned service occurred. My business address is 5440 Morehouse

3   Drive, Suite 4400, San Diego, California 92121. I further declare that I am a member of the bar of

4   this Court at whose direction the service was made.

5   On July 20, 2011, I served the following documents:

6   **1.     FIRST AMENDED COMPLAINT**

7   On the following person(s) in the following manner:

8   X   Sage Knauft
        Ferdie Franklin
9       Helen M. Luetto
        Walsworth Franklin Bevins & McCall, LLP
10      One City Boulevard West, Fifth Floor
        Orange, California 92868
11
    X   Frank C. Brucculeri
12      Michelle E. Ceja
        Kaye, Rose & Partners, LLP
13      1801 Century Park East, Suite 1500
        Los Angeles, CA 90067
14
    X   Geoffrey Robb
15      Gibson Robb & Lindh, LLP
        201 Mission Street, Suite 2700
16      San Francisco, CA 94105

17      **(BY MAIL)** The envelope was mailed with postage thereon fully prepaid. I am "readily"
        familiar with the firm's practice of collection and processing correspondence for mailing. It
18      is deposited with U.S. Postal Service on that same day in the ordinary course of business.

19   X   **(BY ELECTRONIC FILING)** The documents were electronically filed and the CM/ECF
         system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned
20       judge, and any registered users in the case.  The NEF will constitute service of the
         document(s).  Registration as a CM/ECF user constitutes consent to electronic service
21       through the court's transmission facilities.

22
        I declare under perjury under the laws of the State of California that the foregoing is true and
23
    correct and this declaration was executed at San Diego, California, July 20, 2011.
24

25

26      Shurron Smith

27

28

Proof of Service

**Exhibit B**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
STEVEN CAMPBELL, an individual;
and CARLOTA FRANKLIN-CAMPBELL,
an individual,

          Plaintiffs,

     vs.                              CASE No.
                                      10-CV-1821-JM-POR

WILLIAM LOGUE, an individual and
as a Trustee for the Sears/Logue
Revocable Trust; THE SEARS/LOGUE
REVOCABLE TRUST; DAVID MARQUEZ, an
individual; MIKELSON YACHTS, INC.,
a California corporation; NAN YA
PLASTICS CORPORATION, a Foreign
corporation; and NAN YA PLASTICS
CORPORATION, a Delaware corporation,

          Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
AND ALL RELATED CROSS-ACTIONS.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

STEVEN JAY CAMPBELL


APRIL 28, 2011

10:11 a.m.

5440 Morehouse Drive
Suite 4400
San Diego, California


Reported by Denise T. Johnson, CSR No. 11902

1    and question your credibility.

2            Do you understand that?

3        A.    Yes.

4        Q.    Is there any reason you cannot testify fully and

5    accurately today?

6        A.    No.

7        Q.    Are you under any medications that would impair

8    your ability to recall or to think?

9        A.    No.

10       Q.    If you need to take a break or speak with your

11   lawyer for any reason, let us know.  All right?

12       A.    Yes.

13       Q.    And if you do not understand any of my questions,

14   please let me know.  And I'll rephrase it.  Okay?

15       A.    Yes.

16       Q.    If you answer my question, I'll assume you

17   understood it.  All right?

18       A.    Yes.

19       Q.    Do you have any questions before we proceed?

20       A.    No.

21       Q.    I'm going to take a few vitals, if I might?  What

22   is your date of birth?

23       A.    7/13/41.

24       Q.    What is your highest level of education?

25       A.    Master's in -- MSE.

1    sold it in '08.

2         Q.   You had an ownership interest in that company?

3         A.   Yes, I was one of the angel investors.

4         Q.   And what was the other company?

5         A.   Stratacom.

6         Q.   Can you spell that.

7         A.   S-t-r-a-t-a-c-o-m.

8         Q.   Can you give me its history?

9         A.   It was a wide-area network company. It was spun

10   out of another company. Funded in '86. Public in 1990.

11   Acquired by Cisco in '91 or '92.

12        Q.   You had an ownership interest in that company?

13        A.   Yes.

14        Q.   Were you also an angel?

15        A.   Yes.

16        Q.   What did Packeteer do?

17        A.   Traffic management of the Internet.

18        Q.   Was your involvement in those two companies,

19   Packeteer and Stratacom, merely as an investor or were you

20   also involved in management?

21        A.   I was the CEO for both companies and chairman of

22   the board, I think, for both of them.

23        Q.   When did you, if ever, give up those positions as

24   CEO of each company?

25        A.   CEO of Stratacom, '87. I was COO from then on

1   and chairman of the board also.  Packeteer, I was CEO for

2   the first -- through '86 and chairman of the board from

3   then on.

4       Q.   Does that remain true today?  You are on the

5   board of both of those companies?

6       A.   No.  Cisco acquired Stratacom and Packeteer was

7   also acquired in '08.

8       Q.   So you have no further involvement with either

9   company, correct?

10      A.   No.

11      Q.   Since those companies were acquired, had you had

12  any other professional ventures?

13      A.   Yes.

14      Q.   What are those?

15      A.   Inisix.

16      Q.   How do you spell that?

17      A.   I-n-i-s-i-x.

18      Q.   What was your involvement with that company?

19      A.   I was an angel investor and advisor.

20      Q.   What did that company do?

21      A.   Relation databases.

22      Q.   Do you have any role as an officer or director?

23      A.   No.

24      Q.   Are you still involved with that company?

25      A.   No.

154

1                    REPORTER'S CERTIFICATION

2

3        I, Denise T. Johnson, a Certified Shorthand Reporter

4    in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn; that

7    the deposition was then taken before me at the time and

8    place herein set forth; that the testimony and proceedings

9    were reported stenographically by me and later transcribed

10   into typewriting under my direction; that the foregoing is

11   a true record of the testimony and proceedings taken at

12   that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name this

15   2nd day of May, 2011.

16

17

18

19       _/S/ Denise T. Johnson_____

20       Denise T. Johnson, CSR No. 11902

21

22

23

24

25

Toll Free: 800.770.3363
Facsimile: 415.591.3335

ESQUIRE
an Alexander Gallo Company

Suite 1100
44 Montgomery Street
San Francisco, CA 94104
www.esquiresolutions.com

**Exhibit C**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

3

4    _____
                                    )
     STEVEN CAMPBELL, an individual; and  )
5    CARLOTA FRANKLIN-CAMPBELL, an    )
     individual,                     )
6                                    )
                     Plaintiffs,     )
7                                    )
                vs.                  ) Case No.: 3:10-CV-01821-
8                                    )           JM-POR
     WILLIAM LOGUE, an individual and as a )
9    Trustee for the Sears/Logue Revocable )
     Trust; THE SEARS LOGUE REVOCABLE TRUST; )
10   DAVID MARQUEZ, an individual; MIKELSON )
     YACHTS, INC., a California Corporation; )
11   NAN YA PLASTICS CORPORATION, a Foreign )
     Corporation; NAN YA PLASTICS     )
12   CORPORATION, a Delaware Corporation,  )
                                    )
13                   Defendants.     )
                                    )
     _____)
14                                   )
     AND RELATED CROSS-ACTION.        )
15   _____)

16

17

18          Deposition of STEVEN CAMPBELL, taken on

19     behalf of Defendants, at 5440 Morehouse Drive,

20     Suite 4400, San Diego, California, beginning at

21     3:17 p.m., Wednesday, February 8, 2012, before

22     Brooke Silvas, Certified Shorthand Reporter

23     No. 10988.

24

25

```
 1   payments off investments; correct?
 2        A     Return of capital, capital gains, and off
 3   of the investments of which there was a number.
 4        Q     Putting that aside and talking about
 5   income off your labor, did this accident cause you
 6   to lose any income off your labor?
 7        A     I don't know.  The lost opportunity.  I
 8   don't know.  I never got invited on any boards.  I
 9   never got stock options on any other boards.  There
10   were a couple boards that I wasn't capable of
11   serving on.
12        Q     Okay.  So other than lost opportunity, you
13   can't think of any income you were getting because
14   of your labor that stopped because of this accident?
15        A     No.
16        Q     Because you had already resigned from the
17   board of Packeteer; correct?
18        A     Yes.
19        Q     You weren't serving on any other boards at
20   the time that was paying you income; correct?
21        A     No.
22        Q     You didn't have any other jobs that were
23   paying you income by virtue of your labor at the
24   time of the accident; correct?
25        A     I think there were some investments that I
```

20

BARKLEY
Court Reporters

1    made because I got involved and did free consulting,
2    but not any dollars from that.
3         Q    So there wasn't any dollar loss because of
4    the accident; correct?
5         A    Future income loss because of that.  There
6    was no direct income from that, no.
7         Q    And that would be part of your lost
8    opportunity.  Is that what you're talking about?
9         A    Yes.
10        Q    So essentially what I hear you saying is
11   that your lost income claim is just a lost
12   opportunity claim.  That because of this accident,
13   you missed some opportunities to transact business
14   that would have made you money.  Correct?
15        A    Yes.
16        Q    Is that really the sum total of your lost
17   income claim?
18        A    Yes.
19        Q    I would like to go through each
20   opportunity that was actually presented to you that
21   you declined because of your injury.
22        A    Well, in 2009-2010, I had no deal flows,
23   so I had nothing to decline.
24        Q    So is it fair to say that since the
25   accident, no one has offered you any opportunity?

                            21

BARKLEY
Court Reporters

1   wanted me to invest in their company.  Sierra didn't

 2   call me.  Jeff Grazen (phon.) didn't call me.  This

 3   guy Craig Elliot didn't call me during that time.

 4   Just all the people that I got my lease from just

 5   quit calling as far as lead generation or consulting

 6   or follow up or board seats.  Just nobody called

 7   basically.

 8        Q    Can you give me any specific deal that you

 9   did not participate because of your health?

 10       A    If they don't call you, you don't know

 11  what you're missing.  I don't know.

 12       Q    So the answer to that question is no?

 13       A    The deal flow went to zilch basically.

 14       MR. BRUCCULERI:  Which -- it could be because

 15  of your health, it could be because you don't know,

 16  and it could be because of the state of the economy

 17  which has been hitting in the downward spiral since

 18  this period of time; correct?

 19       THE WITNESS:  Correct.  I think the economy has

 20  two pulls.  You earn less input from the investments

 21  that you have.  But I believe there's more

 22  opportunity for these start-ups in a down market

 23  because the big companies quit investing.  They quit

 24  investing in new products.  It's a nice time to

 25  invest in these startups.  There's more mergers and

                              68

                      STEVEN CAMPBELL

1    acquisitions going on, but not as many IPOs.  So

2    it's a balance.

3    BY MR. ROBB:

4        Q    But because you don't know the deals that

5    you missed, you have no way to quantify the value of

6    those deals; correct?

7        A    That's true.  It's just all the way back

8    to 1996, I made 2 million a year.  And after the

9    accident, I didn't.

10       Q    Well, some of the -- we've looked at your

11   tax returns.  When we see the $2 million figures,

12   they're associated with major stock sales, stocks

13   that you held, like Cisco; correct?

14       A    Cisco, what year are you talking about?

15       Q    Whenever you sold a lot of Cisco stock.

16       A    Over the years.  I still have a lot left.

17       Q    How many shares of Cisco do you have left?

18       A    I don't know.  70,000.

19       Q    Okay.

20       A    I don't know.

21       Q    And you could have disposed of those in

22   the last two years or three years and maintained a

23   higher income; correct?

24       A    That was a big mistake.  I had a call on

25   it, and we bought the call-back, which was a big

69

BARKLEY
Court Reporters

**Exhibit  D**

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3

4

5    STEVEN CAMPBELL, an
     individual; and CARLOTA
6    FRANKLIN-CAMBELL, an
     individual,
7

8              Plaintiffs,

9    vs.                    Case No. 10-CV-1821-JM-
                                      DHB
10

11   WILLIAM LOGUE, an individual
     and as a Trustee for the
12   Sears/Logue Revocable Trust;
     THE SEARS LOGUE REVOCABLE
13   TRUST; DAVID MARQUEZ, an
     individual; BLUEWATER YACHTS,
14   INC., a California
     Corporation; NAN YA PLASTICS
15   CORPORATION, a Foreign
     Corporation; NAN YA PLASTICS
16   CORPORATION, a Delaware
     Corporation,
17
               Defendants.
18   _____/

19
     AND RELATED CROSS-ACTIONS.
20

21       DEPOSITION OF WILLIAM MERRELL

22       Taken at San Diego, California

23          Friday, January 4, 2013

24
     Kelley R. Lawrence, CSR
25
     Certificate No. 13587

```
 1   announce it?
 2       A.    If somebody else didn't, I would make everybody[
 3   on the whole boat know what's going on.
 4       Q.    And that's something that was done, essentially,
 5   100 percent of the time?  If someone else hadn't called
 6   it out, that it was something you would take upon
 7   yourself? ]
 8       A.    It's the captain's responsibility.
 9       Q.    When was the first time that you can recall that
10   Mr. Campbell went back to fish onboard his vessel after
11   the incident, if you can recall?
12       A.    I really can't recall exactly.
13       Q.    Can you give me an estimate, perhaps, you know,
14   a certain time of year?
15       A.    It was less than a year after his accident.
16       Q.    And when he went back to fish, in your
17   recollection, did he have any limitations in terms of
18   his abilities to fish at that point?
19           MR. AYERS:  Vague as to time.
20           THE WITNESS:  I could not believe he could walk
21   up the ladder to get up on the bridge and drive the boat.
22   He was amazing.
23   BY MR. BRUCCULERI:
24       Q.    Always has been, from what I hear.  So from your
25   perspective, he didn't have any obvious limitations in
```

1    terms of his ability to engage in sport fishing when he

2    was able to return, whenever that was, roughly within a

3    year?

4    A.   No.

5    Q.   Do you recall at that time whether he complained

6    to you specifically of any pain or problems he was still

7    having as a result of his injuries?

8    A.   No.

9    Q.   Did you notice anything, specifically

10   physically, about him that told you he was still

11   suffering somewhat from injuries he may have suffered

12   during the fall on the Logue vessel?

13   A.   Absolutely the opposite.

14   Q.   Did you notice that he had any mental impairment

15   at all that you could tell in terms of his ability to

16   speak or relate or anything like that?

17   A.   Not at all.

18       MR. BRUCCULERI:  That is all I have, although I

19   do want to take two minutes to go to the restroom.

20       (A recess was taken.)

21                 EXAMINATION

22   BY MR. KLEIN:

23   Q.   Mr. Merrell, my name is Neil Klein.  I think we

24   met previously in Cabo.  I'm going to ask you some

25   questions.  I just want to clarify that I heard you

```
 1   STATE OF CALIFORNIA)

 2

 3   COUNTY OF SAN DIEGO)

 4

 5        I, Kelley R. Lawrence, Certified Shorthand

 6   Reporter No. 13587, for the State of California, do hereby

 7   certify:

 8        That, prior to being examined, the witness named

 9   in the foregoing deposition was duly sworn to testify to

10   the truth, the whole truth and nothing but the truth;

11        That said deposition was taken down by me in

12   shorthand at the time and place therein named, and was

13   thereafter reduced by me to typewritten form, and that the

14   same is a true, correct, and complete transcript of said

15   proceedings;

16        Before completion of the deposition, review of

17   the transcript [X] was [ ] was not requested.  If

18   requested, any changes made by the deponent (and provided

19   to the reporter) during the period allowed are appended

20   hereto.  I further certify that I am not interested in the

21   outcome of the action.

22        Witness my hand this_____day of

23   _____, 20__.

24                        _____

25                        Kelley R. Lawrence, CSR No. 13587
```