**KAYE, ROSE & PARTNERS, LLP**
Frank C. Brucculeri, Esq. (137199)
Daniel F. Berberich, Esq. (215946)
1801 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 551-6555
Facsimile: (310) 277-1220
fbrucculeri@kayerose.com
dberberich@kayerose.com

Attorneys for Defendants
**MIKELSON YACHTS, INC. and
BLUEWATER YACHT BUIILDERS,
LTD.**

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN CAMPBELL, an individual; and CARLOTA FRANKLIN-CAMPBELL, an individual,<br><br>        Plaintiffs,<br><br>        v.<br><br>WILLIAM LOGUE, an individual and as a Trustee for the Sears/Logue Revocable Trust; THE SEARS LOGUE REVOCABLE TRUST; DAVID MARQUEZ, an individual; BLUEWATER YACHTS, INC., a California Corporation; NAN YA PLASTICS CORPORATION, a Foreign Corporation; NAN YA PLASTICS CORPORATION, a Delaware Corporation,<br><br>        Defendants.<br><br>AND RELATED CROSS-ACTIONS | Case No.: 10-CV-1821-JM-DHB<br><br>**IN ADMIRALTY**<br><br>**MIKELSON YACHTS, INC. AND BLUEWATER YACHT BUILDERS, LTD.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN AFFIRMATIVE DEFENSES**<br><br>Date:    February 19, 2013<br>Time:    11:00 a.m.<br>Judge:  Jeffrey T. Miller<br>Place:  Courtroom 16 |

Defendants MIKELSON YACHTS, INC. (hereinafter "Mikelson") and

BLUEWATER YACHT BUILDERS, LTD. (hereinafter "Bluewater") hereby

submit their Opposition to Plaintiffs' Motion for Partial Summary Judgment as to

Certain Affirmative Defenses (Dkt. #'s 122 & 123 ).

//

---

Kaye, Rose & Partners LLP

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 1

II. BRIEF STATEMENT OF FACTS .................................................. 3

    A. Background ................................................................. 3

    B. Marlin Sport Fishing .................................................. 3

    C. The ANDALE ............................................................. 4

    D. Leading Up to the Incident ......................................... 4

    E. The Incident ................................................................ 5

    F. Post-Incident .............................................................. 5

III. LEGAL ARGUMENT ............................................................... 7

    A. Mikelson and Bluewater Have Withdrawn Various
       Affirmative Defenses Addressed in Plaintiffs' Motion. ................... 7

    B. Summary Judgment Legal Standard .................................... 7

    C. The Defense of Assumption of Risk Is Appropriate in an
       Admiralty Case and Has Been Established. ......................... 8

       1. There is no uniform general maritime law rule
          regarding primary assumption of the risk; therefore, it
          is appropriate to supplement with and apply substantive
          California law .................................................................. 8

       2. Under California law, Plaintiffs' claim against
          Defendants is barred by the primary assumption of the
          risk doctrine. .................................................................. 13

    D. There is a Genuine Issue Whether Mr. Campbell Failed to
       Mitigate His "Lost Opportunity" Damages. .................................. 17

    E. There is a Genuine Issue as to Whether Plaintiff's Injuries
       Resulted From a Superseding Cause. ........................................ 20

IV. CONCLUSION ........................................................................ 22

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY

Kaye, Rose & Partners LLP

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Arreola v. County of Monterey*
99 Cal.App.4th 722 (2002)..................................................20

*Beninati v. Black Rock City, LLC*
175 Cal. App. 4th 650 (2009)..............................................14

*Boehm v. American Broadcasting Co*
929 F.2d 482 (9th Cir. 1991)...............................................20

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................7

*Dunion v. Kaiser*
124 F. Supp. 41(E.D. Pa. 1954)...........................................9

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*
476 U.S. 858 (1986)............................................................8

*E.E.O.C. v. Pape Lift, Inc.*
115 F.3d 676 (9th Cir. 1997)..............................................20

*Edwards v. Occidental Chemical Corp.*
892 F.2d 1442 (9th Cir. 1990)............................................20

*Ferrari v. Grand Canyon Dories*
32 Cal. App. 4th 248 (1995)...............................................13

*Ford v. Gouin*
3 Cal. 4th 339, 345 (1992)..............................................13, 14

*Haeuser v. Dept'l of Law*
368 F.3d 1091 9th Cir. 2004)..............................................20

*Hogan v. Hellman*
7 F. 2d 949 (S.D. Cal. 1925).............................................10

*Knight v. Jewett*
3 Cal.4th 296, 313 (1992)..............................................13, 14

*Lockhart v. Martin*
159 Cal. App. 2d 760 (1958).............................................16

*Manning v. Gordon*
853 F.Supp. 1187 (N.D. Cal. 1994).....................................11

*Manta Management Corp. v. City of San Bernardino*
43 Cal.4th 400, 411 (2008)................................................20

*Mosca v. Lichtenwalter*
58 Cal. App. 4th 551 (1997)..............................................14

ii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Nissan v. Fire & Marine Ins. Co., ltd v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000) ......................................................7

*Odima v. Westin Tucson Hotel*
    53 F.3d 1484 (9th Cir. 1994) ......................................................20

*Ortiz v. Bank of America Nat'l Trust and Savings*
    852 F.2d 383 (9th Cir. 1987) ......................................................20

*Palestina v. Fernandez*
    701 F. 2d 438 (5th Cir. 1983) ......................................................8

*Scheiner v. St. Jovite*
    180 F. Supp. 452 (N.D. Cal. 1960) ......................................................9

*Sias v. City Demonstration Agency*
    588 F.2d 692 (9th Cir. 1987) ......................................................17

*Stimson v. Carlson*
    11 Cal. App. 4th 1201 (1992) ......................................................13, 14

*Truong v. Nguyen*
    156 Cal. App. 4th 865 (2007) ......................................................14

*Whalen v. BMW*
    864 F. Supp. 131 (S.D. Cal. 1994) ...................................... 10, 11, 16

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.* 348 U.S. 310 (1955) ........... passim

*Yamaha Motor Corp. v. Calhoun*
    516 U.S. 199 (1996) ......................................................8

**Statutes**

**FRCP 56** ......................................................7, 21

Other Authorities

*Restatement (Second) of Torts § 440* ......................................................20, 21

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

STEVEN CAMPBELL and CARLOTA FRANKLIN-CAMPBELL ("Plaintiffs") seek summary judgment as to as to Mikelson and Bluewater's affirmative defenses affirmative defenses of 1) assumption of risk; 2) failure to mitigate; and 3) superseding cause. As will be demonstrated herein below, Mikelson and Bluewater have met their burden of proof on each of these defenses and Plaintiffs' Motion must therefore be denied.

First, the assumption of the risk defense applies here to bar Plaintiff's claims against Logue Defendants. There is no uniform rule in admiralty about the application of the assumption of the risk doctrine. In the absence of such a rule, the United States Supreme Court has held admiralty courts look to the state where the court is sitting. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.* 348 U.S. 310 (1955) California's primary assumption of the risk doctrine applies to Plaintiffs' claims, and warrants judgment in favor of the Logue Defendants. Mr. Campbell fell fishing for marlin from the bow of the ANDALE. Marlin fishing is an aggressive and dangerous sport, and is especially dangerous on the bow. Mr. Campbell, an avid fisherman, assumed the risk of falling, and his claims against the boat owner should be barred by the assumption of the risk doctrine.

Second, Plaintiff failed to mitigate his damages. Plaintiff claims lost income damages for three years following his fall. However, Plaintiff's boat captain of 8 years testified that Plaintiff had fully recovered mentally and physically within 3-4 months of his fall. Since Plaintiff had recovered fully, he should have used reasonable care and diligence in getting back into investments, advising his contacts that he was ready to receive deals, and otherwise minimizing any lost opportunity damages. Because Plaintiff failed to do so, he failed to mitigate his damages. Third, there is ample evidence in the record coming from Plaintiff Steven Campbell himself that a superseding event caused his fall and resulting injuries. Although Plaintiff has sued the manufacturers of

1

Kaye, Rose & Partners LLP

the ANDALE on the basis of some purported deficiency of the foredeck slip resistant surface, his Complaint allegations and his sworn testimony directly contradict such a theory.  Specifically, Steven Campbell alleges that his fall was caused by an abrupt and unexpected movement of the ANDALE which was being operated by Defendant David Marquez.  Mr. Campbell testified that as he was coming down the starboard side of the ANDALE reaching for the rail, he took three or four steps when ". . . all of a sudden, my feet went out from under me towards the bow, violently went out from underneath me towards the bow." *Campbell 1*: 77:19-23[1].  Mr. Campbell describes further that, "my feet went out from under me. **The boat went forward violenty.**" *Campbell1:* 77:19-21 (Emphasis added.)  Critically, when he fell, Mr. Cambell's feet did not slide out in front of him, they went out behind him. *Campbell 1*: 72:25-73-3.  His upper body went toward the stern while his feet went toward the bow.  As Mr. Campbell himself explained, this could only "happen **if the boat moved forward rapidly.**" *Campbell 1*: 72:25-73-3. (Emphasis added.)  Finally, and perhaps conclusively, Mr. Campbell's testimony demonstrates well that he did not "slip" on the foredeck surface and that the quality and characteristics of the surface had nothing whatever to do with his fall.  Mr. Campbell testified, "**I believe if I would have slipped, my feet would have gone towards the stern not towards the bow.**" *Campbell 1*: 77:24-75:1. (Emphasis added).  Campbell's own testimony concerning the "violent" forward movement of the ANDALE establishes the bones of Defendants' affirmative defense based on an independent, intervening and/or superseding event which resulted in the subject accident.

---

[1] The Defendants have already and/or will lodge all cited depositions with the Court in connection with the pending Motions.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Kaye, Rose & Partners LLP

## II.  BRIEF STATEMENT OF FACTS

### A.  Background

On December 7, 2008, Plaintiff Steven Campbell ("Campbell" or "Plaintiff") fell aboard the *ANDALE*, a 57 foot recreational fishing yacht owned by Defendant William Logue as Trustee of the Logue/Sears Revocable Trust (collectively, Logue) and manufactured by Mikelson Yachts, Inc. ("Michelson") and Bluewater Yacht Builders, Ltd. ("Bluewater") (collectively, the "Manufacturers") while striped marlin sport fishing. At the time of the incident, Defendant David Marquez ("Capt. Marquez") was the Captain of the *ANDALE*. That fall and the purported damages arising out of the fall are the subject of this lawsuit.[2]

### B.  Marlin Sport Fishing

Striped Marlin sport fishing is an inherently dangerous and physically demanding sport.[3] The typical striped marlin outside of Cabo San Lucas weighs over 100 lbs.[4] Casting and fishing from the bow of any boat is more dangerous to the lower center of gravity and consequent greater movement.[5] Plaintiff owns a 60 foot yacht, the *CORSARIO*, on which he has logged 4,500 hours.[6] Plaintiff is a self-described expert and experienced marlin angler[7] who has competed and won multiple tournaments.[8]

---

[2] Plaintiff's First Amended Complaint (hereinafter, the "FAC").
[3] (Deposition of William Merrell, Vol. 2, January 4th 2013 (hereinafter "Merrell Depo. Vol. 2") at 31:2-25; 32:1-25; 33:1-25; 34:1-6; Deposition of Harvey Hunnicutt, July 30th 2012 (hereinafter "Hunnicutt Depo") at 23:5-25; 24:18-24; 25:1-5; Hunnicutt Report, p. 2-3).
[4] (Hunnicut Depo. 32: 7-9; Andy Marquez Depo. Vol. 2).
[5] (Hunnicut Report, p. 4; Deposition of Captain Tom Carney ("Carney Depo.") 130: 22-25; 131: 1-5; Deposition of William Logue ("Logue Depo."), 49:7-12; 50: 9-13; Merrel Depo. Vol. 2, 32:22-34:14; Campbell Depo. Vol 1, 108:17-23, 134:17-135:14).
[6] Campbell Depo. 1 at 17:22-18:2.
[7] (Campbell Depo. 1 at 25:6-11, 25:21-27:1, 135:15-19; Logue Depo. at 60:16-61:1.)
[8] Campbell Depo. 1 at 25:21-26:23; 140:21-141:8.

Kaye, Rose & Partners LLP

### C. The ANDALE

The *ANDALE* is a 57 foot Mikelson Yacht manufactured specifically for Logue in July of 2007.[9] The stern/cockpit area of the *ANDALE* has teak flooring.[10] The foredeck/bow area of the *ANDALE* has molded, texturized fiberglass.[11] The teak is less slippery than the texturized fiberglass on the bow.[12] When not used by Logue, the *ANDALE* was chartered by other sport fisherman on at least 112 occasions without any complaint regarding the surface of the deck or Capt. Marquez' operation.[13]

At all times relevant the *ANDALE* was berthed in Cabo San Lucas.[14] Capt. Marquez' son, Andy Marquez, typically served as deckhand. Andy Marquez' duties included casting from the foredeck for the fishermen and bringing the rod to the stern so they could avoid the hazards associated with fishing from the bow.[15]

### D. Leading Up to the Incident

Captain Marquez, and others, warned Campbell on multiple occasions not to cast or fish from the bow of the *ANDALE*.[16] The days immediately preceding the incident were marked by an unprecedented amount of striped marlin, leading to what has been described as "epic" sport fishing conditions. Plaintiff, his friend, Robert Garavello ("Garavello"), and Logue fished for striped marlin for four or five days, alternating between the *CORSARIO* and the *ANDALE*.[17]

---

[9] Logue Depo. at 18:3-19:5
[10] Logue Depo at 143:4-5
[11]
[12] Logue Depo at 146:3-147:2
[13] David Marquez Depo. at 27:1-19, 137:14-138:7; Logue Depo. at 34:5-11, 48:9-49:2, 52:13-20.
[14] (David Marquez Depo. at 106:23-107:2; Logue Depo. at 19:13-20:2).
[15] (Andy Marquez Depo. 1 at 12:16-23, 16:24-17:16.)
[16] (David Marquez Depo. at 36:7-37:7; Andy Depo. 1 at 32:7-15, 32:20-33:9; Logue Depo. at 53:7-14, 54:4-55:5.)
[17] (Campbell Depo, Vol. 1, 102:12-20); Logue Depo, 66:9-14; 69:21-70:21; Deposition of Robert Garavello (hereinafter "Garavello Depo") at 21:25-22:4; 36:9-24; 46:12-19; 132:10-15).

4

Kaye, Rose & Partners LLP

Immediately before the incident, Capt. Marquez, Andy Marquez, Logue and Garavello observed that Campbell was visibly exhausted.[18] Logue told Campbell to stop and rest three times.[19] Campbell responded that he "knew what he was doing,"[20] after moved to the bow of the *ANDALE*.[21] Campbell was aware that the ocean was choppy at or about the time of the incident.[22]

### E.     The Incident

Mr. Campbell elected to forego having the deckhand, Andy Marquez, cast at the bow and bring the rod to Campbell in the cockpit.[23] Campbell prefers to bait, hook, land, spot and catch his own fish.[24] Shortly before he fell, Mr. Campbell cast from the bow and lost his bait.[25] Campbell cast again into the bait ball. Immediately thereafter, Plaintiff fell on his left side, breaking his left hip.[26]

### F.     Post-Incident

Plaintiff alleges that he sustained lost income damages based on alleged loss of business opportunities.[27] Campbell testified that he received an opportunity to invest in a company called TAC and invested funds in it during 2009 and 2010.[28] He contends that he might have invested more money in TAC

---

[18] (Andy Depo. 1 at 31:11-18; Campbell Depo. Ex. 8; Garavello Depo. at 40:11-21, 70:22-71:13, 112:6-113:6; Logue Depo, 72:22-73:6, 78:23-83:6; David Marquez Depo. at 131:9-132:12, 133:6-134:18.)
[19] Logue Depo at 72:22-73:6, 78:23-83:6, 81:8-82:13
[20] (Campbell Depo. Ex. 8; Garavello Depo. at 70:22-71:13, 112:6-113:6.)
[21] (Campbell Depo. 1 at 71:11-23; Andy Depo. 1, 30:3-20; David Marquez Depo at 77:21-78:14.)
[22] (Hunnicut Report at p. 2; Deposition of Robert Garavello (hereinafter "Garavello Depo") at 36:9-37:21; Logue Depo at 69:21-70:17). (Campbell Depo. 1 at 54:17-55:3, 107:15-108:23, 134:17-135:14; 145:10-25; Carney Depo. at 130:22-131:5; David Marquez Depo at 146:6-147:2; Hunnicut Report, p.3-4; Merrell Depo. 2 at 32:14-34:15; Logue Depo. at 49:3-12, 50:4-13.)
[23] Campbell Depo. 1 at 108:17-109:12.)
[24] (Campbell Depo. 1 at 42:16-43:3, 36:4-11; Garavello Depo. at 125:12-15.)`
[25] (Campbell Depo. 1 at 70:12-21, 84:3-13; Andy Depo. 1 at 20:8-22; Andy Depo. 2 at 82:9-83:5, 83:14-17.)
[26] (Campbell Depo. 1 at 70:12-21; Andy Depo. 1 at 20:8-22; Andy Depo. 2 at 82:9-83:5, 83:14-17.)
[27] [Plaintiffs' Amended Complaint, ¶ 43; Deposition of Plaintiffs' economist expert, Jeffrey Porter, at 21:15-18].
[28] [Plaintiff's Deposition at 43:21 – 44:1].

5

1   if he were healthier at the time.[29] Campbell also contends he had an opportunity

2   to invest in a company called PNC Technology in 2010, but declined partly

3   because he did not have the time for it.[30]

4   Likewise, Campbell invested over $100,000 in a company called IV Med

5   during 2008, but it ran into financial trouble when a company called Hospira

6   breached its contract with IV Med.[31] Mr. Campbell alleges that, had he not been

7   injured, he could have traveled in 2008 or 2009 to the Dominican Republic,

8   where Hospira was located, and resolved the breach of contract issue.[32]

9   Mr. Campbell claims that due to the accident he was unable to get back

10   into the investing circle until late 2011 when he received his "first real good

11   opportunity" to invest in the Pertino deal.[33] Likewise, Mr. Campbell's good

12   friend and fellow investor, Craig Elliott, testified that from the time after the

13   accident until at least the summer of 2011. Campbell did not take any action to

14   get back into the "deal flow" where potential investment opportunities could be

15   discovered.[34]

16   Campbell's boat captain of 8-years, Bill Merrell, testified that he saw Mr.

17   Campbell appeared to have fully recovered mentally and physically 3-4 months

18   after the incident. Captain Merrell also testified that Campbell was "one hundred

19   percent" normal in his ability to speak and "sharp, the same guy."[35] Captain

20   Merrell further testified that Campbell was fishing, climbing up the ladder to the

21   flybridge of his 60' Hatteras Sport fishing Yacht and driving the boat, with no

22   mental impairment "at all" and simply "amazing."

23

---

24   [29] [Plaintiff's Deposition at 43:13-15].
25   [30] [Plaintiff's Deposition at 34:5-11].
     [31] [Plaintiff's Deposition at 62:17-21].
26   [32] [Plaintiff's Deposition at 63:11-17].
27   [33] [Plaintiff's Deposition at 22:1-7; Deposition of Jeffrey Porter at 82:11-17].
28   [34] [Deposition of Craig Elliott at 108:7 – 109:16].
     [35]

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## III. LEGAL ARGUMENT

### A. Mikelson and Bluewater Have Withdrawn Various Affirmative Defenses Addressed in Plaintiffs' Motion.

Mikelson and Bluewater agree to withdraw[36] the following affirmative defenses addressed in Plaintiffs' motion for summary judgment:

- Mikelson and Bluewater's 7th Affirmative Defense: Civil Code §§ 1431.1 to 1431.5;

- Mikelson and Bluewater's 16th Affirmative Defense: Injuries caused by unreasonable, unforeseeable, inappropriate purpose and improper use and abuse;

- Mikelson's 21st, 25th & 33rd Affirmative Defense and Bluewater's 25th Affirmative Defense: Conformity with applicable existing state-of-the-art;

- Bluewater's 38th Affirmative Defense: No liability for design and/or manufacture of the ANDALE's non-skid deck surface;

- Bluewater's 39th Affirmative Defense: No liability for the insufficiency of the design of the ANDALE's non-skid deck surface.

### B. Summary Judgment Legal Standard

It is well established that the Moving Party has the burden of production and persuasion to demonstrate that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Accordingly, Plaintiffs must show that the Defendants do not have evidence from which a jury could find an essential element of Defendants' defense. FRCP 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan v. Fire & Marine Ins. Co., ltd v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

---

[36] Certain affirmative defenses refer to legal principles which may not necessarily constitute an "affirmative defense" in the technical sense. Accordingly, withdrawal of those affirmative defenses is made without waiver of the potential application of the legal principles stated therein.

Kaye, Rose & Partners LLP

1 Further, a conclusory allegation that the opposing party has no evidence is
2 insufficient to meet the above standard. *Celotex*, Supra at 326.

### C. The Defense of Assumption of Risk Is Appropriate in an Admiralty Case and Has Been Established.

5 Assumption of risk is raised as an affirmative defense in Mikelson's 11th,
6 14th and 22nd Affirmative Defenses and in Bluewater's 11th and 14th Affirmative
7 Defenses.

> **1. There is no uniform general maritime law rule regarding primary assumption of the risk; therefore, it is appropriate to supplement with and apply substantive California law.**

12 Generally, substantive maritime rules govern maritime cases, and state law
13 must yield to the required uniformity of maritime law. *See, e.g., E. River S.S.*
14 *Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *S. Pac. Co. v.*
15 *Jensen*, 244 U.S. 205, 216-217 (1917). However, when there is no established
16 general maritime law rule on a particular issue, and the subject does not require
17 national uniformity, admiralty courts may look to the rule of the state in which
18 the court is sitting. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310
19 (1955); *see also, Palestina v. Fernandez*, 701 F. 2d 438 (5th Cir. 1983); *Yamaha*
20 *Motor Corp. v. Calhoun*, 516 U.S. 199, 215-216 (1996).

21 In this case, California's "primary" assumption of risk doctrine should
22 supplement general maritime law. There is no federal statute either establishing
23 or prohibiting "primary" assumption of risk. Applying California's primary
24 assumption of risk doctrine here does not interfere with any "uniformity" of
25 general maritime law, because there is no uniformity in general maritime law
26 sportfishing cases. There is no prevailing general maritime rule regarding the
27 application of the doctrine of primary assumption of risk.

28 Plaintiffs incorrectly state that there is no such thing as an assumption of

8

Kaye, Rose & Partners LLP

risk defense in admiralty, citing to some cases that have not adopted the assumption of risk defense. However, the primary assumption of the risk doctrine has been applied in several maritime cases. "There are great numbers of decisions wherein the doctrine of assumption of risk has been invoked as a defense to liability for personal injuries falling under admiralty jurisdiction." *Dunion v. Kaiser*, 124 F. Supp. 41, 44 (E.D. Pa. 1954). The fact that there is disagreement among the federal courts on whether assumption of the risk is applicable in a maritime context shows that there is no established uniform maritime rule relating to assumption of risk. Therefore, the proper course of action is to supplement general maritime law with California law.

For example, in *Scheiner v. St. Jovite*, the 17 year old plaintiff was riding on the bow of a 14 foot powerboat in the San Francisco Bay when the boat made a turn and he fell into the water. 180 F. Supp. 452 (N.D. Cal. 1960). The court dismissed the case, finding that a boy of plaintiff's age and experience "knew, or should have known, that straddling the bow of a fast motorboat is dangerous in the extreme." *Id.* at 454. The court held that the plaintiff assumed the risks "naturally incident to riding [on the bow] in a precarious position on a high speed motorboat." *Id.*

In *Dunion v. Kaiser*, the plaintiff's powerboat was damaged in a race collision. The court applied assumption of the risk and dismissed the case. 124 F. Supp. 41 (E.D. Pa. 1954). The court defined the assumption of the risk doctrine, citing William Prosser's authoritative text on tort law.

> In its primary and proper sense, it [assumption of risk] means that the plaintiff has consented to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk. By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself [and his property], and relieve the defendant of responsibility. 124 F. Supp. at 44-45, citing Prosser, *Torts*, Sec. 51, pp. 377, 383.

The court added that because the plaintiff consented to the risk, the

9

1   defendant owed no duty to him and therefore could not be negligent. *Id.* at 45.

2   The court concluded, "Libelant [plaintiff] having chosen to enter his boat in a

3   racing event in which he knew it would encounter high speed maneuvers in close

4   proximity to other craft operating in rough and confused water must be left to

5   bear the loss which has resulted." *Id.* at 45.

6         In *Hogan v. Hellman*, the plaintiff was injured while riding on a fishing

7   boat around San Clemente Island. 7 F. 2d 949 (S.D. Cal. 1925). The court

8   applied the assumption of the risk doctrine and found that no negligence or

9   liability could be proven against the owner of the boat. *Id.* at 953. The court

10  found that the plaintiff "sustained no injury that was not the result of the ordinary

11  and known perils of the sea, or incidental to customary and normal movement of

12  a boat such as the Traveler [the fishing boat] upon the surface of the ocean." *Id*.

13  The court noted that the plaintiff chose to take the voyage after being fully

14  informed of the size, condition, and equipment of the fishing boat and "she must

15  be held to have assumed all the risks incident to traveling on such a boat on such

16  a voyage. . .All of the injuries of which she [the plaintiff] complains are the result

17  of the elements, and no act of the crew proximately caused any of her hurts." *Id*.

18        Plaintiffs anticipated that Logue Defendants would point to *Whalen v.*

19  *BMW*, and unsuccessfully attempted to distinguish the present case from *Whalen*.

20  While *Whalen* involves a yacht racing collision where there was an express

21  assumption of risk, the analysis regarding assumption of risk in maritime cases

22  still applies. In *Whalen v. BMW*, Judge Enright of this Court held that the

23  assumption of the risk doctrine was a potentially valid defense in a maritime

24  case. 864 F. Supp. 131 (S.D. Cal. 1994). The *Whalen* case involved a yacht-

25  racing collision. Defendant moved for summary judgment based on the

26  assumption of the risk doctrine. The Court denied the motion because there were

27  factual issues on whether the injured pilot assumed the risk of collision-related

28  injuries, but the Court did agree with the defendant's position that the application

of assumption of the risk in a maritime case was an open issue. This Court then declined to dismiss the defendant's affirmative defense of assumption of the risk and deferred the defense to the jury.

While *Whalen* involves an express assumption of risk in the form of a race application, Plaintiff here has also admitted to expressly assuming the risk of striped marlin sportsfishing on the bow in the open ocean. As a factual matter, Plaintiff also assumed the risk of falling by fishing from the bow. Plaintiff, a tournament-level marlin fisherman, admitted in his deposition to knowing it was more dangerous to fish from the bow than the cockpit (rear of the boat) and that there is a greater risk of falling on the bow than the cockpit. (Campbell Depo. Vol 1, 108:17-23, 134:17-135:14.) Plaintiff also knew that the boat moves more at the bow than at the cockpit. (Campbell Depo. Vol 1, 108:11-23) Despite knowing about the increased risks, Plaintiff prefers to cast from the bow and chose to cast from the bow on the day of his fall. (Campbell Depo. Vol 1, 36:4-11, 41:16-43:3.) Even if Plaintiff did not sign a form, as a factual matter, he admitted to knowing the risks of fishing from the bow in the open ocean and choosing to engage in that activity despite knowing the risks. Plaintiff knowingly assumed the risk of falling just as much as the plaintiff in *Whalen*.

Plaintiffs also cite to *Manning v. Gordon*, where the Northern District of California court refused to adopt the primary assumption of risk doctrine, because no federal court had endorsed its application in a yacht racing context. *Manning v. Gordon*, 853 F.Supp. 1187, 1189-90 (N.D. Cal. 1994). *Manning* is distinguishable because defense counsel in that case failed to assert the obvious basis for application of the primary doctrine of assumption of the risk, which is that California law should supplement general maritime law since there is no general maritime rule on assumption of the risk. Under *Wilburn Boat*, the absence of an established maritime rule, and in deference to California's local interest and public policy determination, California law should apply to

11

Kaye, Rose & Partners LLP

supplement general maritime law. *See, Wilburn Boat Company v. Fireman's Fund Insurance Company*, 348 U.S. 310, 314-21 (1955). The mere fact that there was no established maritime law on the subject should have allowed the court to supplement maritime law with state law.

Contrary to Plaintiffs' assertion, simply because some admiralty courts have refused to adopt the assumption of risk defense does not meant that it is unavailable in a maritime case. Instead, the fact that the Southern and Northern Districts in California have taken differing positions on the primary assumption of the risk doctrine shows there is no established maritime rule rejecting the doctrine. Therefore, under *Wilburn Boat*, general maritime law should be supplemented with California law on primary assumption of the risk. *Wilburn Boat*, 348 U.S. at 314-21 (1955).

Importantly, California law regarding the primary assumption of risk doctrine is not in conflict with the characteristic features of general maritime law. The "primary" assumption of risk doctrine is predicated on an absence (or fulfillment) of defendant's duty. Where a defendant owes no duty to the plaintiff, there can be no breach of that duty, and therefore the plaintiff cannot establish his negligence claim. Applying the California primary assumption of risk doctrine to sportfishing does not interfere with the harmony and uniformity which general maritime law strives to bring to international or interstate relations. Sportfishing does not materially affect international or interstate commerce such that uniformity in the application of primary assumption of risk is required. Sports and recreational activities involve more "local concerns" than international or interstate concerns, since most water-based sports, including sportfishing, are equally as capable of being engaged in on non-navigable intrastate waters as on navigable waters. As a result, there is no uniformity – or need for uniformity – in the application of primary assumption of risk to water-based sports and recreational activity cases.

12

Kaye, Rose & Partners LLP

**2.** **Under California law, Plaintiffs' claim against Defendants is barred by the primary assumption of the risk doctrine.**

Logue Defendants have already presented this argument in great detail in their Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, filed with this Court. Logue Defendants hereby fully incorporate the arguments and factual contentions already discussed in that motion. Logue Defendants will summarize the facts and legal arguments as described in full detail in that motion.

Under California law, the application of the doctrine of primary assumption of the risk is a question of duty that may be decided on summary judgment. *Knight v. Jewett*, 3 Cal.4th 296, 313 (1992). Primary assumption of the risk applies where "by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no duty to protect the plaintiff from the particular risk of harm that caused the injury." *Id.* at 315-316. Primary assumption of the risk survived California's adoption of comparative fault because the defendant has not breached a duty of care to the plaintiff and therefore a comparative fault analysis is not triggered. *Id.* at 310. Under primary assumption of the risk, a defendant can only be held liable if he intentionally injures the plaintiff or engages in conduct that is so reckless as to be totally outside the range or ordinary activities involved in the activity. *Ford v. Gouin*, 3 Cal. 4th 339, 345 (1992). Conduct is entirely outside the range of ordinary activity if it can be prohibited without discouraging vigorous participation in the activity. *Id.*

The doctrine of primary assumption of the risk is routinely applied to water-related activities, including fishing and powerboating. *See, Ford v. Gouin*, 3 Cal. 4th 339 (1992) (summary judgment affirmed where plaintiff was injured while waterskiing); *Stimson v. Carlson*, 11 Cal. App. 4th 1201 (1992) (pet.

13

denied) (summary affirmed where plaintiff was injured while sailing); *Ferrari v.*
*Grand Canyon Dories*, 32 Cal. App. 4th 248 (1995) (pet. denied) (summary
judgment affirmed where plaintiff was injured while white water rafting); *Mosca*
*v. Lichtenwalter*, 58 Cal. App. 4th 551 (1997) (pet. denied) (***summary judgment***
***affirmed where plaintiff was injured while fishing***) (emphasis added); *Truong v.*
*Nguyen*, 156 Cal. App. 4th 865 (2007) (summary judgment affirmed where
plaintiffs' daughter died while riding a jet ski).  Courts have even extended the
application of the doctrine to non-sporting activities such as the risk of getting
burned while attending the Burning Man Festival in the Nevada desert. *Beninati*
*v. Black Rock City, LLC*, 175 Cal. App. 4th 650, 658-659 (2009) (pet. denied).

      The California Supreme Court applied the primary assumption of the risk
doctrine, as set forth in *Knight*, to noncompetitive water sports. *See e.g. Ford v.*
*Gouin*, 3 Cal. 4th 339 (1992) (court upheld summary judgment and applied
assumption of risk doctrine as a complete bar to plaintiff's claims against her
friend driving the boat for the injuries she sustained when she hit a tree while
waterskiing backward and barefoot); *Stimson v. Carlson*, 11 Cal. App. 4th 1201
(1992) (pet. denied) (doctrine of assumption of the risk was applicable to the
captain of a sailboat who failed to warn his passenger of an intended change in
course, resulting in serious injury when the passenger was hit on the arm by the
boat's swinging boom); *Mosca v. Lichtenwalter*, 58 Cal. App. 4th 551 (1997)
(pet. denied) (applying doctrine of primary assumption of risk to sportfishing
after noting "[h]ooking and catching fish require a great deal of knowledge,
physical skill and attention"); *Truong v. Nguyen*, 156 Cal. App. 4th 865 (2007)
("the primary assumption of risk doctrine applies to the activity of riding
personal watercraft, regardless of whether the rider is operating the
vessel...[R]iding as a passenger on a personal watercraft, meets the test from
*Record*, because it is done for enjoyment or thrill, requires physical exertion as
well as elements of skill, and involves a challenge containing a potential risk of

Kaye, Rose & Partners LLP

1  injury").

2       In assumption of the risk cases, a defendant is only liable if his conduct is

3  totally outside the range of ordinary activities in the sport, which is defined by

4  those activities that can be prohibited without discouraging vigorous

5  participation in the activity.  There is no admissible evidence that Captain

6  Marquez maneuvered the ANDALE at all.  Garavello, who was in the cockpit at

7  the time of Plaintiff's fall (located right above the boat's engines) testified that

8  the boat was in neutral.  (Garavello Depo., 55:3-6.)  He further testified that he

9  did not hear the engines revving up or see any wash coming out of the back of

10  the stern of the boat from the engines at the time of Plaintiff's fall.  (Garavello

11  Depo., 55:3-24.)  Even if Captain Marquez had maneuvered the boat, there is no

12  evidence that he maneuvered the boat in a way that would have contributed to

13  Plaintiff's fall, and certainly no evidence that he maneuvered the ANDALE in a

14  way that is inconsistent with the vigor of ocean sportfishing for striped marlin.

15  (Andy Marquez Depo. Vol. 2, 136:7-10; Garavello Depo., 54:18-24, 55:16-23,

16  115:7-10; Andy Marquez Depo. Vol. 1, 28:13-15, 35:8-11; David Marquez

17  Depo., 114:12-16, 114:24-115:1; Logue Depo., 50:22-51:2.)  All people aboard

18  the ANDALE except for Plaintiff agree that David Marquez did nothing outside

19  the range of ordinary ocean fishing activities and did not increase the inherent

20  risks of ocean fishing in relation to the incident.  (Andy Marquez Depo. Vol. 1,

21  28:13-15, 35:8-11; Andy Marquez Depo. Vol. 2, 136:7-10; Garavello Depo.,

22  54:18-24, 55:16-23, 73:23-25, 115:7-10; Logue Depo., 50:22-51:2; David

23  Marquez Depo., 114:12-16, 114:24-115:1.)  Plaintiff has no admissible personal

24  knowledge as to how Captain Marquez maneuvered the boat.  His **assumption** as

25  to the Captain's maneuvering is pure speculation.

26       Even Plaintiff's own captain, William Merrell, acknowledged that striped

27  marlin fishing in open ocean is an aggressive and dangerous sport and is

28  especially dangerous on the bow.  (Merrell Depo. Vol. 2, 30:24-31:13; 31:21-

Kaye, Rose & Partners LLP

1   34:6.) At a minimum, it involves the aggressive movement of the sportfishing

2   boat in chasing and fighting fish, of which striped marlin is the most aggressive

3   and unpredictable. It also involves the movement of the sportfishing boat subject

4   to wind and waves. It is particularly dangerous to engage in this sport from the

5   bow of the boat in the ocean. (Merrell Depo. Vol. 2, 30:24-31:13; 31:21-34:6.)

6   As documented above, California courts have repeatedly held that riding in

7   vessels on the water is an activity worth encouraging and protecting and that

8   imposing liability for the inherent risks associated with this activity would

9   discourage vigorous participation in the activity. If courts were to impose

10  liability on boat owners and operators for the passengers falling to the deck while

11  sportfishing, it would chill participation in ocean sportfishing. The sportfishing

12  industry would disappear and friends would not take friends out fishing.

13       Waves and wakes of all sizes, including unexpected waves, are

14  unavoidable and inherent risks in ocean sportfishing. *See, Lockhart v. Martin*,

15  159 Cal. App. 2d 760 (1958) ("It is a matter of common knowledge that the

16  movements of fishing boats and other small water craft are constantly affected by

17  the waves and thereby made unsteady, and that this is true without regard to the

18  care exercised in their operation."). Unlike in *Whalen*, there is no fact issue to be

19  determined, as this analysis is a duty question for the court and Plaintiff admitted

20  that he was well aware of the risks associated with fishing from the bow. He

21  knew it was dangerous and yet chose to fish there anyway. (Campbell Depo.

22  Vol. 1, 108:17-23, 134: 17-135: 14.) He chose to not hold on to the railing,

23  unquestionably impairing his ability to prevent a fall should he lose his balance

24  with the natural movement of the boat on the ocean. (Campbell Depo. Vol. 1,

25  76:1-77:7, 127:18-20.)

26       There is no evidence that Defendants did anything to increase the inherent

27  risks of fishing on the ocean. Because maritime law may and should be

28  supplemented with California law in this case, which includes the primary

Kaye, Rose & Partners LLP

1    assumption of risk doctrine as a complete bar to recovery, Logue Defendants'

2    assumption of risk defense is a valid defense and Plaintiffs' motion for partial

3    summary judgment as to this defense should be denied.

4        **D.**    <u>**There is a Genuine Issue Whether Mr. Campbell Failed to**</u>

5              <u>**Mitigate His "Lost Opportunity" Damages.**</u>

6        Mikelson and Bluewater raised failure to mitigate as their 13th affirmative

7    defense. As noted in Plaintiffs' motion, in order to demonstrate that a plaintiff

8    failed to mitigate his or her damages, a defendant must establish "(1) that the

9    damage suffered by plaintiff could have been avoided . . . and (2) that plaintiff

10    failed to use reasonable care and diligence" when seeking to minimize losses."

11    *Sias v. City Demonstration Agency*, 588 F.2d 692, 696-697 (9th Cir. 1987).

12        Plaintiffs' First Amended Complaint alleges that Plaintiff Steven

13    Campbell sustained lost income damages based on alleged loss of business

14    opportunities. [Plaintiffs' First Amended Complaint, ¶ 43; Deposition of

15    Plaintiffs' economist expert, Jeffrey Porter, at 21:15-18]. Essentially, Mr.

16    Campbell claims that as a result of the accident he was not able physically and/or

17    mentally to seek out investment opportunities from which he could have profited.

18    For example, Mr. Campbell testified that he received an opportunity to invest in

19    a company called TAC and invested funds in it during 2009 and 2010.

20    [Plaintiff's Deposition at 43:21 – 44:1]. He contends that he might have invested

21    more money in TAC if he was healthier at the time. [Plaintiff's Deposition at

22    43:13-15]. Mr. Campbell also contends he had an opportunity to invest in a

23    company called PNC Technology in 2010, but he declined partly because he did

24    not have the time and for it. [Plaintiff's Deposition at 34:5-11]. Likewise, Mr.

25    Campbell invested over $100,000 in a company called IV Med during 2008, but

26    it ran into financial trouble when a company called Hospira breached its contract

27    with IV Med. [Plaintiff's Deposition at 62:17-21]. Mr. Campbell alleges that if

28    he had not been injured from the accident he could have traveled in 2008 or 2009

1  to the Dominican Republic, where Hospira was located, and resolved the breach

2  of contract issue. [Plaintiff's Deposition at 63:11-17].

3      Mr. Campbell claims that due to the accident he was unable to get back

4  into the investing circle until late 2011 when he received his "first real good

5  opportunity" to invest in the Pertino deal. [Plaintiff's Deposition at 22:1-7;

6  Deposition of Jeffrey Porter at 82:11-17]. Likewise, Mr. Campbell's good friend

7  and fellow investor, Craig Elliott, testified that from the time after the accident

8  until at least the summer of 2011 Mr. Campbell did not take any action to get

9  back into the "deal flow" where potential investment opportunities could be

10  discovered. [Deposition of Craig Elliott at 108:7 – 109:16].

11      Despite Mr. Campbell's claim that the accident left him physically and

12  mentally unable to get back into the "deal flow" for nearly three years until late

13  2011, the evidence in this case strongly suggests otherwise. For example, Mr.

14  Campbell's boat captain of eight years, Bill Merrell, testified that he saw Mr.

15  Campbell three 3-4 months after the accident and to him it appeared Mr.

16  Campbell had fully recovered mentally and physically by that time. Captain

17  Merrell testified that Mr. Campbell was "one hundred percent" normal in his

18  ability to speak and "sharp, the same guy." [Merrell Depo., 47:9 – 48:17].

19  Captain Merrell further testified that Mr. Campbell was fishing, climbing up the

20  ladder to the flybridge of his 60' Hatteras Sport fishing Yacht and driving the

21  boat, with no mental impairment "at all" and simply "amazing." [Merrell Depo.,

22  47:9 – 48:17].

23      Based on the foregoing testimony that Mr. Campbell had fully recovered

24  mentally and physically within 3-4 months after the accident, there is strong

25  evidence he was certainly healthy enough physically and mentally to find

26  investment opportunities from that point forward. This evidence of course

27  contradicts Mr. Campbell's assertion that he was not in sufficient health

28  physically and/or mentally in order to find investment opportunities during the

18

three years after the accident. The obvious implication of this evidence is that Mr. Campbell failed to use reasonable care and diligence in getting back into the "deal flow" for approximately three years following the accident in order to minimize any "lost opportunity" damages. Since Plaintiff had fully recovered mentally and physically within 3-4 months of his fall, there is strong evidence that Plaintiff was healthy enough physically and mentally to find investment opportunities during the three years after the accident. Once he had recovered mentally and physically, Plaintiff had a duty to use reasonable care and diligence in getting back into investments in order to minimize any "lost opportunity" damages. Based on the foregoing, there is at least a genuine issue whether Plaintiff failed to mitigate his "lost opportunity" damages.

Second, Plaintiff had a duty to mitigate his damages by taking proper care of any injuries he claims to have sustained as a result of the accident. Defendants maintain that Plaintiff's subdural hematoma is wholly unrelated to his fall. See Defendants' Motion for Summary Adjudication Re Causation filed herein. If, however, this Court finds that the hematoma is somehow related to Plaintiff's fall, then Plaintiff had a duty to mitigate his damages relating to his subdural hematoma. Following his surgery relating to his hematoma, Plaintiff was told by Dr. Nicola Bugelli to keep his wound moist by treating it with Bactroban, Adaptic and gauze and by keeping it covered all the time. (Subpoenaed Records From Sharp Grossmont Hospital, bates numbers 6-9) However, on a check-up, Dr Bugelli noted that Plaintiff did not follow the doctor's recommendation. Plaintiff failed to use the Adaptic, and instead cleaned his wounds with hydrogen peroxide, although he was given wound cleanser at the last visit. (Supbeonaed records from Sharp Grossmont Hospital, bates numbers 69-71) The doctor's notes state that "[t]he wound is quite dry, likely because he [Plaintiff] has not been using Adaptic on the wound, and the Bactroban as probably being absorbed into the gauze." Plaintiff failed to mitigate his damages by failing to take proper

19

Kaye, Rose & Partners LLP

1  care of his wounds, as directed by his physician.

2  Additionally, the question of mitigation is a question of fact for the jury or

3  the trier of fact. Ninth Circuit cases assessing the issue of mitigation of damages

4  have been consistently decided by the trier of fact. *Haeuser v. Dept'l of Law*, 368

5  F.3d 1091, 1100-01 (9th Cir. 2004) (mitigation issue decided during four-day

6  bench trial); *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 687-85 (9th Cir. 1997)

7  (reasonableness of employee's efforts to mitigate decided by jury); *Odima v.*

8  *Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1994) (employer's burden of

9  proving failure to mitigate decided during two-and-one-half day bench trial);

10  *Boehm v. American Broadcasting Co*, 929 F.2d 482, 485-88 (9th Cir. 1991)

11  (whether job was substantially equivalent and whether employee made

12  reasonable efforts to find employment decided by jury); *Edwards v. Occidental*

13  *Chemical Corp.*, 892 F.2d 1442, 1448-49 (9th Cir. 1990) (employer's burden of

14  proving failure to mitigate decided at bench trial); *Ortiz v. Bank of America Nat'l*

15  *Trust and Savings*, 852 F.2d 383, 387 (9th Cir. 1987) (reasonableness of

16  mitigation efforts is question of fact).

17  Michelson and Bluewater submit that they have satisfied their burden that

18  there is a question of fact whether Plaintiffs mitigated their damages. The

19  appropriate decider of that question of fact is the trier of fact.

20  **E.     There is a Genuine Issue as to Whether Plaintiff's Injuries**

21  **Resulted From a Superseding Cause.**

22  Mikelson and Bluewater raised superseding cause as their 18th affirmative

23  defense. Under the *Restatement (Second) of Torts* § 440, a superseding cause is

24  "an act of a third person or other force by which its intervention prevents the

25  actor from being liable for harm to another which his antecedent negligence is a

26  substantial factor in bringing about." *Manta Management Corp. v. City of San*

27  *Bernardino*, 43 Cal.4[th] 400, 411 (2008). The question of whether a cause is a

28  superseding cause is usually a question of fact. *Arreola v. County of Monterey*,

20

1     99 Cal.App.4[th] 722, 760 (2002).

2         Plaintiffs allege that Mikelson and Bluewater are liable for Plaintiffs'

3     injuries based on the following claims: (1) the "slip-proof" surface utilized by

4     Mikelson Yachts and Bluewater was improperly selected, designed and

5     manufactured and was defective for the purpose for which it was intended in that

6     it was unreasonably slippery during normal and expected use; and (2) Mikelson

7     Yachts and Bluewater failed to adequately warn or instruct regarding the

8     potential risks caused by the unreasonably slippery foredeck and unreasonably

9     low railings. [First Amended Complaint at ¶¶ 38 & 51].

10        In their First Amended Complaint, Plaintiffs allege that Captain David

11     Marques maneuvered the ANDALE in an abrupt and unexpected way which

12     caused Mr. Campbell to fall. [Plaintiffs' First Amended Complaint, ¶ 13;

13     Plaintiff's Deposition at 72:17-19]. Plaintiff's testimony is that Captain David

14     Marquez maneuvered the boat "aggressively" and "without warning."

15     [Plaintiffs' First Amended Complaint, ¶ 13; Plaintiff's Deposition at 56:9-13].

16     This testimony, if believed, constitutes an independent, intervening and/or

17     superseding event which resulted in the subject accident. This sort of act by a

18     third party, such as Captain Marquez, fits squarely within the definition of

19     superseding cause as defined in the Restatement of Torts (Second) § 440.

20        Moreover and perhaps more importantly, there is ample evidence in the

21     record coming from Plaintiff Steven Campbell himself that a superseding event

22     caused his fall and resulting injuries. Mr. Campbell testified that as he was

23     coming down the starboard side of the ANDALE reaching for the rail, he took

24     three or four steps when ". . . all of a sudden, my feet went out from under me

25     towards the bow, violently went out from underneath me towards the bow."

26     *Campbell* 1: 77:19-23. In Mr. Campbell's own words, "my feet went out from

27     under me. **The boat went forward violenty."** *Campbell1:* 77:19-21 (Emphasis

28     added.) Critically, when he fell, Mr. Cambell's feet did not slide out in front of

Kaye, Rose & Partners LLP

Kaye, Rose & Partners LLP

him, they went out behind him. *Campbell 1*: 72:25-73-3. His upper body went toward the stern while his feet went toward the bow. As Mr. Campbell himself explained, this could only "happen if **the boat moved forward rapidly.**" *Campbell 1*: 72:25-73-3. (Emphasis added.) Finally, and perhaps conclusively, Mr. Campbell's testimony demonstrates well that he did not "slip" on the foredeck surface and that the quality and characteristics of the surface had nothing whatever to do with his fall. Mr. Campbell testified, "I believe if I would have slipped, my feet would have gone towards the stern not towards the bow." *Campbell 1*: 77:24-75:1. In sum, Campbell's own testimony concerning the "violent" forward movement of the ANDALE establishes the bones of Defendants' affirmative defense based on an independent, intervening and/or superseding event which resulted in the subject accident. Based on the foregoing, there is at least a genuine issue whether Plaintiffs' injuries resulted from a superseding cause.

## IV. CONCLUSION

Based on the foregoing, Defendants MIKELSON YACHTS, INC. and BLUEWATER YACHT BUILDERS, LTD. respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment.

DATED: February 5, 2013          KAYE, ROSE & PARTNERS, LLP


By:  */s/ Frank C. Brucculeri*
     Frank C. Brucculeri, Esq.
     Daniel F. Berberich, Esq.
     Attorneys for MIKELSON
     YACHTS, INC. and BLUEWATER
     YACHT BUILDERS, LTD.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT