Exhibit "C"



**ErgoTek**
*Consultants in Ergonomics, Human Factors and Safety*

February 20, 2012

Frank C. Brucculeri, Esq.
Kaye, Rose, et al.
Sent via email to expedite receipt

Re:  Comments regarding M. Sampsel report of findings in Campbell v. Mikelson

Dear Mr. Burcculeri:

This letter provides a brief response to Mr. Sampsel's report of findings in the subject matter.

1. "Nonskid" is an erroneous term that has been rejected by the field for decades. All surfaces permit "skidding" if horizontal forces are sufficient. Slip-resistant is what Mr. Sampsel is intending to refer to.

2. The synopsis of the accident scenario described by Mr. Sampsel is not consistent with Mr. Campbell's deposition testimony. His testimony describes his feet being pulled behind him forcing a fall forward. This indicates that his feet were gripped by the deck and that deck movement forced the fall.

3. Paragraph number 3 is incorrect. A monotonic increase in the static coefficient of friction is not an index of increasingly safe walking surfaces. Very high static COFs promote trips and falls. Static Coefficients of Friction (COF) follow the Goldilocks paradigm. Too small a COF or too large a COF are hazardous. The level of COF that is just right is determined by the intended use or "required" COF. Moreover, water on a surface does not always reduce the COF, nor is the "sliding" COF always less than the static COF. The available COF is determined by the "sandwich" created by the shoe sole material and properties, the contaminant, and walking surface material and properties. This sandwich can produce material variations in the available static COF; sometimes the contaminant increases the COF in other cases it may have no effect or will reduce the static COF. I will provide references when I return to my office next week substantiating the above.

4. Paragraph number 4 is generally correct.

5. Paragraph number 5 is correct. ABYC has not specified a surface or available COF for vessels such as that under question in this matter. I have used 0.5 to determine whether the manufacture had met general industry standards for slip-resistance.

6. Mr. Sampsel misunderstood the paper/standards that he cited. The Navy has no standard requiring Naval vessels have deck COFs of 0.85 or greater as he concludes. The standards Mr. Sampsel is referring to address a measurement protocol with a specific "sandwich" to determine if slip-resistant surface applications have been applied to specification. This standardizes the evaluation of the quality of slip-resistant surface application. While those materials used in the standard to evaluate deck applications, the COFs post-application are different for different shoe sole material and nature of contaminants. Certain war-fighting operations require high COF surfaces. However, such levels of COF are not used on most deck surfaces of naval vessels, or at transitions from inside to outside superstructures aboard such vessels, to avoid crew members from tripping and falling while moving about the ship. These measurement protocol standards are aimed at judging contractor performance using a uniform evaluation procedure and have no bearing in this matter.

7. Mr. Sampsel's reported dry COF is much lower than that which I measured. It may reflect differences in methodology, lack of proper calibration or damage to the spring used in his device, or a combination of both. Please note that it is impossible to achieve the level resolution of COF reported by Mr. Sampsel using his device. Moreover, he reported only dry COF test results. We were aware of a cleaning agent being applied to the decks by the owner's crew and that it may not have been rinsed off. The surfactant would alter the COF from normal values. His wet COFs should have been higher as were mine--indicating that the cleaning agent was reducing the available COFs. I would request his complete dataset for further examination.

8. Paragraph eight has no relevance. Mr. Sampsel and I measured the COF at various deck locations; including the area where the fall was reported to have occurred. The impact of deck slope was integrated into our measurements. Any attempt to further adjust such measurements for deck tumblehome would produce erroneous results.

9. Paragraph nine has no relevance to this case. There was no abrupt transition in COFs from the stern to bow that occurred immediately before the fall. Mr. Campbell had been on the bow some time before the fall occurred. His mental model, which Mr. Sampsel was referring to, was not incorrect for the deck on the bow. If one does not expect a change in the available COF, gait properties may be inappropriate and promote excessive shear force--overcoming the available COF and, thereby, resulting in a slip. The transition was not abrupt and time on the bow was sufficient for him to detect and adjust gait behaviors for the available COF. Adjustments in gait occur within a second or two when one is standing or walking onto a new surface. These adjustments are made autonomically and relatively quickly--so prior experiences minutes, hours, days or years ago have no relevance.

10. Paragraph ten has no bearing in this matter as noted in the paragraph above. Mr. Campbell was standing and moving about the bow well before the fall event.

11. Paragraph eleven offers no merit. The COF aboard the ANDALE met design standards and guidelines.

12. Paragraph twelve favors a grit-based paint system for providing slip-resistance. However, Mr. Sampsel fails to note the advantage of the Mikelson design in that it does not wear and create greater risk of slip/fall accidents as grit-based systems do. Grit based paint systems have to be constantly maintained to prevent development of wear or smoothing patterns that create differences in COFs within the same deck area. This is much more hazardous than a surface topology that does not wear down rapidly.

13. Paragraph thirteen has no relevance. The Mikelson deck is designed to invaginate into a boat shoe's soft sole material. That adhesion provides frictional resistance. The hard polymer bucket does not permit invagination and and the surface topology on the Mikelson yacht is uniform. The lack of adhesion and constant geometry of the deck topology (slides over the peaks of the polygons) allows the hard smooth bucket to slide more easily than on a nonuniform or random surface grit-based surface. Had the bucket been of a different type of polymer, it would not have slipped. The bucket's behavior has no relevance to that of the boat shoe-sea water-deck sandwich and the resulting COF.

14. I could tell that the deck surface had been cleaned with a surfactant or detergent that had not been rinsed off at the time I made the initial measurements. That affected the dry COF and feel of the deck. When water was splashed on the deck, it partially-rinsed the surfactant from the surface and my COF measurements increased in magnitude. I am confident that Mr. Sampsel's measurements will show the same effect. When I retested the vessel at a second date with the deck surface rinsed and dried, the static COF increased materially--as did the feel of the deck's gripping quality. If that deck cleaning protocol was used, it would defeat or reduce design-induced COFs for all surfaces. All safe COF deck or walking surfaces can be defeated by surfactant effects or cleaning agents that are not fully-rinsed from the surface.

15. The force guage used by Mr. Sampsel is susceptible to damage and loss of calibration. My equipment is strain-guage based and does not suffer such problems. I pre- and post-calibrated the strain-guage to determine that measurements were not affected by loss of instrument calibration. Moreover, the greater the normal force, the greater the COF values. The weight of the human causes the shoe's sole material to depress into the crevices of the polyhedron and creates adhesion. Using too light of a load would lower the measured COF. The deck is designed to act like football cleats that engage the shoe sole material. The greater the normal force (or load), the greater the effect of the cleats upon the material pressed down upon them. You can demonstrate this in the courtroom if desired.

16. If you provide me with his complete dataset, I can check to determine the sensitivity of his equipment and methods.

If you have questions, please contact me.

Sincerely,

*[signature]*

Steven F. Wiker, Ph.D., CPE