**KAYE, ROSE & PARTNERS, LLP**
Frank C. Brucculeri, Esq. (137199)
Daniel F. Berberich, Esq. (215946)
1801 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 551-6555
Facsimile: (310) 277-1220
fbrucculeri@kayerose.com
dberberich@kayerose.com

Attorneys for Defendants
**MIKELSON YACHTS, INC. and**
**BLUEWATER YACHT BUIILDERS,**
**LTD.**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN CAMPBELL, an individual; and CARLOTA FRANKLIN-CAMPBELL, an individual, | Case No.: 10-CV-1821-JM-DHB |
| | **IN ADMIRALTY** |
| Plaintiffs, | **DEFENDANTS MIKELSON YACHTS, INC. AND BLUEWATER YACHT BUILDERS, LTD.'S TRIAL BRIEF** |
| v. | |
| WILLIAM LOGUE, an individual and as a Trustee for the Sears/Logue Revocable Trust; THE SEARS LOGUE REVOCABLE TRUST; DAVID MARQUEZ, an individual; BLUEWATER YACHTS, INC., a California Corporation; NAN YA PLASTICS CORPORATION, a Foreign Corporation; NAN YA PLASTICS CORPORATION, a Delaware Corporation, | Trial: May 28, 2013 at 10:00 AM<br>Judge: Jeffrey T. Miller<br>Place: Courtroom 5D |
| Defendants. | |
| AND RELATED CROSS-ACTIONS | |

## I.   **INTRODUCTION**

Plaintiff Steven Campbell ("Plaintiff") seeks damages for personal injuries suffered after he fell while big game fishing on the bow of the motor yacht *ANDALE* off the coast of Cabo San Lucas, Mexico on December 7, 2008. The *ANDALE,* a 57' Mikelson Sportfisher on which Plaintiff was an invited guest,

Kaye, Rose & Partners LLP

was owned by Defendants William Logue and the Sears/Logue Revocable Trust ("Logue Defendants") and manufactured by Defendants Mikelson Yacht, Inc. and Bluewater Yacht (collectively "Mikelson"). Mikelson and Bluewater submit that Plaintiff's claims based on an allegedly slippery deck are nothing more than an afterthought and that Plaintiffs' claims against the manufacturers have been baseless from the outset. Conveniently, the Court need look no further than Plaintiff's own sworn testimony about the incident to conclude that Plaintiff is incapable of making a prima facie case for liability against Mikelson and Bluewater on his two stated Strict Product Liability theories – Defective Design and Failure to Warn.

First, although Plaintiff has admitted although he fished from the foredeck of ANDALE on a number of previous occasions, the very first time he noticed that the deck was purportedly slippery was during an inspection of ANDALE by experts conducted over two years following the incident.[1] Indeed, Plaintiff admits that he never previously noticed that the foredeck of the ANDALE was slippery. *Id.* Second, and this point cannot be emphasized enough, Plaintiff readily admits that he did not "slip" on the foredeck surface prior to his fall.[2] Rather, he claims that as he took several steps aft from the bow, his feet "violently went out from underneath me towards the bow."[3] Critically, Plaintiff alleges that this loss of footing was caused when "the boat went forward violently."

Having admitted that he did not "slip" on the deck, and that his feet went "violently from underneath him" when the "vessel went violently forward," Plaintiffs ask this Court to find that the slip resistant ANDALE deck was

---

[1] Campbell Declaration, Dkt. No. 149-1, at paragraph 7.
[2] Mr. Campbell testified, **"I believe if I would have slipped, my feet would have gone towards the stern not towards the bow."** *Campbell 1*: 77:24-75:1. (Emphasis added).
[3] Campbell Depo. Vol. 1, 1: 77:19-23

Kaye, Rose & Partners LLP

1  somehow insufficient or defective because it didn't miraculously allow him to

2  recover his footing and prevent his fall. Defendants respectfully submit that

3  based on Plaintiffs' claims and admissions, no surface exists that could have

4  prevented his fall. Simply put, Plaintiffs' liability arguments concerning the

5  alleged defective design of the foredeck surface defy logic. Moreover, Plaintiffs

6  fail to offer any expert testimony[4] (from an accident reconstructionist, bio-

7  mechanics expert or otherwise) to demonstrate that any alleged defect in the

8  ANDALE's non-skid surface precluded Plaintiff from falling after his feet went

9  violently from underneath him. Absent any such testimony to explain how the

10  ANDALE deck surface was somehow supposed to rescue Plaintiff mid-fall,

11  Defendants submit that Plaintiff cannot establish liability against the Defendants.

12  The expert Plaintiffs do offer in this area, Michael Sampsel, admittedly did not

13  perform an accident reconstruction of any kind and is therefore incapable of

14  rendering any opinion connecting an alleged defect in the foredeck to the cause

15  of Plaintiff's fall. All Mr. Sampsel did was use an improperly calibrated device

16  to conduct coefficient of friction tests on the ANDALE foredeck more than 2

17  years after the incident. Even if fully credited, Mr. Sampsel's conclusion that the

18  COF of the deck surface was defective more than 2 years after the incident does

19  not remotely establish that the purported defect was a contributing cause of

20  Plaintiff's fall.

21  Plaintiffs' argument concerning an alleged deficiency of the foredeck

22  railing is likewise easily resolved by resort to Plaintiff's unequivocal sworn

23  testimony on the subject. In the moment before the incident Plaintiff casted

24  toward the bait ball from the bow pulpit and missed. Noting that the bait ball

25

26  [4] Plaintiff's only liability expert regarding the alleged deficiency of the foredeck

27  surface, Mr. Sampsel, did not perform an accident reconstruction and has offered no valid opinion that any alleged deficiency in the deck surface was a

28  contributing cause of Plaintiff's fall and resulting injuries.

Kaye, Rose & Partners LLP

was going to move through the hull from left to right, Plaintiff turned to make his way from the bow pulpit to the starboard rail where he intended to again cast into the bait ball. Instead of taking a route to the stern along and adjacent to the available starboard hand rail, Plaintiff took a direct line across the deck from the bow to the starboard rail. In so choosing, Plaintiff broke a well established "Cardinal Rule" applicable to vessel slip and falls, and precluded his use of the available handrail that could have prevented his fall. In his *Boat Accident Reconstruction and Litigation* treatise, Plaintiff's liability expert, Michael M. Sampsel, re-states the Rule as follows:

> An old adage 'One hand for the boat and another hand for you' is applicable in many slip and falls. If a handrail or other stabilizing surface is available and not used by the boater, a fall can be expected.[5]

Plaintiff, an experienced boater and fisherman chose not to use the available handrail (and indeed took a course across the deck that precluded its use) and should bear the sole responsibility for the consequences of that decision.

Plaintiff's claims based on an alleged failure to warn of course fail because Plaintiff can't establish the existence of a deck defect in the first instance. Even if Plaintiff were to establish a deck defect, Defendants can and will establish that they never received any claims, complaints or criticisms about the foredeck surface nor were they aware of any incident in which an owner of his guest fell on the foredeck of a Mikelson yacht. Even Plaintiff himself never complained about the foredeck surface prior to the incident. In sum, Plaintiffs cannot establish the existence of any notice of a defect to Defendants and its failure to warn claim therefore must fail.

---

[5] Roy Scott Hickman and Michael M. Sampsel, *Boat Accident Reconstruction and Litigation*, Third Edition, Chapter 8, "Product Liability Issues," at Section 8.4, page 143 (excerpts of which will be introduced at Trial).

Finally, this Court will hear a good many additional very sound and compelling factual and legal arguments from the Logue and Marquez Defendants that also support Mikelson and Bluewater's position in this case that Plaintiff alone is responsible for his fall aboard the ANDALE. Rather than repeat those additional arguments herein, however, Mikelson and Bluewater direct the Court to the facts and arguments set forth in the Trial Briefs submitted by the Logue and Marquez defendants, which arguments these Manufacturer Defendants adopt in total.[6]

## II.   THE PARTIES

### A.   Plaintiff Steven Campbell

Mr. Campbell is a self described "retired" engineer turned millionaire who spends his ample free time travelling the world, hunting, golfing, fishing and from time to time investing in startup companies. He is an expert marlin fisherman who has competed in and won multiple marlin fishing tournaments. He owns a 60-ft Hatteras Sport Fishing Yacht named the CORSARIO, berthed in Cabo San Lucas and San Diego. Campbell employs a private boat captain, Bill Merrill, for the CORSARIO.

On October 8th 2008, Campbell suffered a heart attack and underwent a stenting procedure to correct coronary artery disease. He was prescribed anti-coagulants and anti-platelet medications Aspirin and Ticlid to treat his cardiovascular issues. Despite this heart condition, numerous other maladies and ailments and his 67 years of age, he had a well deserved reputation for fishing

---

[6] The only instance in which Mikelson and Bluewater diverge from the other defendants is the manner in which Plaintiff fell. Relying on other eye witness testimony, the Logue and Marquez Defendants contend that Plaintiff's feet were facing the stern (and not the bow) after his fall. Mikelson and Bluewater don't necessarily dispute this alternative view of the accident. Rather, the Manufacturer Defendants contend that Plaintiff is stuck with his version of the incident and is now effectively estopped to deny that version and its implications on Plaintiff's Strict Product Liability claims.

very long days and continuing well into the late afternoon and evening hours – when less hearty souls retired for the day. Indeed, his tenacity and dogged determination earned him the nickname, "Captain Midnight."

Campbell had fished with Captain Marquez on the ANDALE at least 8-10 times prior to the incident and had casted from the bow or foredeck on a multitude of occasions as well. He never complained about the condition of the foredeck surface or noted that it was slippery. Critically, he never requested any changes to the foredeck surface or suggested that any warnings concerning the surface were warranted. In fact, Campbell's insistence on fishing from the bow of the ANDALE on the date of the incident without complaint is ample indication that he deemed the foredeck a safe and suitable platform for his anticipated fishing activities.

### B. Plaintiff Carlota Franklin-Campbell

Carlota Franklin-Campbell is Campbell's second wife. She has filed a claim for loss of consortium in this action, and was 63-years old at the time of the incident. The Campbells employed a live-in maid and gardener prior to the incident.

### C. Defendants Mikelson Yachts, Inc. and Bluewater Yacht Builders, Ltd.

Mikelson built and sold the ANDALE to Defendant Bill Logue. Bluewater manufactured the ANDALE for Mikelson (and Logue) based on plans and specifications provided by Mikelson and architectural drawings from famed yacht designer Tom Fexus. ANDALE was one of 124 yachts built by Bluewater for Mikelson over a period of nearly 30 years with the same foredeck design and slip resistant foredeck surface. Other than Plaintiff's lawsuit, neither company has ever received any complaint from any customer or passenger concerning the suitability or design of the foredeck slip resistant surface. Likewise, neither company is aware of or has received any complaints concerning any slips or falls on the foredeck of the Vessels built by Bluewater with the same or virtually

1  identical non-skid pattern as that used on *ANDALE*.

2  **D.  Defendant David Marquez**

3  Captain Marquez is a Mexican national and was the professional captain

4  retained by Logue to operate the ANDALE during its outings in Cabo San Lucas.

5  At the time of the incident, Marquez' son Andy Marquez ("Andy") was the

6  deckhand of the *ANDALE*.

7  **E.  Defendants William Logue & The Sears/Logue Revocable**

8  **Trust**

9  Logue and The Sears/Logue Revocable Trust purchased the ANDALE

10  from Defendant Mikelson and owned the Vessel at the time of the involved

11  incident.  While owned by Logue, ANDALE was permanently berthed in Cabo

12  San Lucas. Logue hired Marquez in Cabo San Lucas to be the ANDALE's

13  captain and care for boat.  Logue was 67-years old at the time of the incident.

14  **III.  STATEMENT OF FACTS**

15  **A.  Background**

16  On December 7, 2008, Plaintiff Steven Campbell fell aboard the *ANDALE*,

17  a 57 foot recreational fishing yacht owned by Defendant William Logue as

18  Trustee of the Logue/Sears Revocable Trust (collectively, "Logue") and

19  manufactured by Mikelson Yachts, Inc. ("Michelson") and Bluewater Yacht

20  Builders, Ltd. ("Bluewater") (collectively, the "Manufacturers") while striped

21  marlin sport fishing. At the time of the incident, Defendant David Marquez

22  ("Capt. Marquez") was the Captain of the *ANDALE*. That fall and the purported

23  damages arising out of the fall are the subject of this lawsuit.[7]

24  **B.  Marlin Sport Fishing**

25  Striped Marlin sport fishing is an inherently dangerous and physically

26

27

28  [7] Plaintiff's First Amended Complaint (hereinafter, the "FAC").

Kaye, Rose & Partners LLP

Kaye, Rose & Partners LLP

demanding sport.[8] The typical striped marlin outside of Cabo San Lucas weighs over 100 lbs.[9] Casting and fishing from the bow of any boat is more dangerous to the lower center of gravity and consequent greater movement.[10] Plaintiff owns a 60 foot yacht, the *CORSARIO*, on which he has logged 4,500 hours.[11] Plaintiff is a self-described expert and experienced marlin angler[12] who has competed and won multiple tournaments.[13]

### C.   The ANDALE

The *ANDALE* is a 57 foot Mikelson Yacht manufactured specifically for Logue in July of 2007.[14] The stern/cockpit area of the *ANDALE* has teak flooring.[15] The foredeck/bow area of the *ANDALE* has molded, texturized fiberglass.[16] When not used by Logue, the *ANDALE* was chartered by other sport fisherman on at least 112 occasions without any complaint regarding the surface of the deck or Capt. Marquez' operation.[17]

At all times relevant the *ANDALE* was berthed in Cabo San Lucas.[18] Capt.

---

[8] Deposition of William Merrell, Vol. 2, January 4th 2013 (hereinafter "Merrell Depo. Vol. 2") at 31:2-25; 32:1-25; 33:1-25; 34:1-6; Deposition of Harvey Hunnicutt, July 30th 2012 (hereinafter "Hunnicutt Depo.") at 23:5-25; 24:18-24; 25:1-5; Hunnicut Report, p. 2-3.
[9] Hunnicut Depo. 32: 7-9; Andy Marquez Depo. Vol. 2.
[10] Hunnicut Report, p. 4; Deposition of Captain Tom Carney ("Carney Depo.") 130: 22-25; 131: 1-5; Deposition of William Logue ("Logue Depo."), 49:7-12; 50: 9-13; Merrel Depo. Vol. 2, 32:22-34:14; Campbell Depo. Vol. 1, 108:17-23, 134:17-135:14.
[11] Campbell Depo. 1 at 17:22-18:2.
[12] Campbell Depo. 1 at 25:6-11, 25:21-27:1, 135:15-19; Logue Depo. at 60:16-61:1.
[13] Campbell Depo. 1 at 25:21-26:23; 140:21-141:8.
[14] Logue Depo. at 18:3-19:5
[15] Logue Depo. at 143:4-5
[16] Jack Chen Depo.
[17] David Marquez Depo. at 27:1-19, 137:14-138:7; Logue Depo. at 34:5-11, 48:9-49:2, 52:13-20.
[18] David Marquez Depo. at 106:23-107:2; Logue Depo. at 19:13-20:2.

8

Marquez' son, Andy Marquez, typically served as deckhand. Andy Marquez' duties included casting from the foredeck for the fishermen and bringing the rod to the stern so they could avoid the hazards associated with fishing from the bow.[19]

### D. Leading Up to the Incident

Captain Marquez, and others, warned Campbell on multiple occasions not to cast or fish from the bow of the *ANDALE*.[20] The days immediately preceding the incident were marked by an unprecedented amount of striped marlin, leading to what has been described as "epic" sport fishing conditions. Plaintiff, his friend, Robert Garavello ("Garavello"), and Logue fished for striped marlin for four or five days, alternating between the *CORSARIO* and the *ANDALE*.[21]

Immediately before the incident, Capt. Marquez, Andy Marquez, Logue and Garavello observed that Campbell was visibly exhausted.[22] Logue told Campbell to stop and rest three times.[23] Campbell responded that he "knew what he was doing,"[24] after moved to the bow of the *ANDALE*.[25] Campbell was aware

---

[19] Andy Marquez Depo. 1 at 12:16-23, 16:24-17:16.

[20] David Marquez Depo. at 36:7-37:7; Andy Depo. 1 at 32:7-15, 32:20-33:9; Logue Depo. at 53:7-14, 54:4-55:5.

[21] Campbell Depo., Vol. 1, 102:12-20); Logue Depo, 66:9-14; 69:21-70:21; Deposition of Robert Garavello (hereinafter "Garavello Depo") at 21:25-22:4; 36:9-24; 46:12-19; 132:10-15.

[22] Andy Depo. 1 at 31:11-18; Campbell Depo. Ex. 8; Garavello Depo. at 40:11-21, 70:22-71:13, 112:6-113:6; Logue Depo., 72:22-73:6, 78:23-83:6; David Marquez Depo. at 131:9-132:12, 133:6-134:18.

[23] Logue Depo at 72:22-73:6, 78:23-83:6, 81:8-82:13

[24] Campbell Depo. Ex. 8; Garavello Depo. at 70:22-71:13, 112:6-113:6.

[25] Campbell Depo. 1 at 71:11-23; Andy Depo. 1, 30:3-20; David Marquez Depo. at 77:21-78:14.

9

Kaye, Rose & Partners LLP

1    that the ocean was choppy at or about the time of the incident.[26]

2    **E.    The Incident**

3       Plaintiff testified that as he was coming down the starboard side of the

4 ANDALE reaching for the rail, he took three or four steps when "And all of a

5 sudden, my feet went out from under me towards the bow, violently went out

6 from underneath me towards the bow." Campbell fell on his left side, right on

7 his left hip. (Campbell Depo. Vol. 1, 1: 77:19-23) (Emphasis added)

8 Specifically, Plaintiff testified that, **"my feet went out from under me. The**

9 **boat went forward violently."** (Campbell Depo. Vol. 1, 77:19-21) (Emphasis

10 added) When he came to rest on the foredeck of the Vessel, Plaintiff's feet were

11 facing the bow. (Campbell Depo. Vol. 1, 72:20-24) When he fell, Plaintiff's

12 feet did not slide out in front of him, they went out behind him. (Campbell

13 Depo. Vol. 1, 72:25-73-3). His upper body went toward the stern while his feet

14 went toward the bow – "which would happen if the boat moved forward

15 rapidly." (Campbell Depo. Vol. 1, 72:25-73-3) Plaintiff admits that he did not

16 "slip" on the foredeck surface. Specifically, Mr. Campbell testified, **"I believe if**

17 **I would have slipped, my feet would have gone towards the stern not**

18 **towards the bow."** (Campbell Depo. Vol. 1, 77:24-75:1) (Emphasis added).

19 Mr. Campbell elected to forego having the deckhand, Andy Marquez, cast at the

20 bow and bring the rod to Campbell in the cockpit.[27] Campbell prefers to bait,

21 hook, land, spot and catch his own fish.[28] Shortly before he fell, Mr. Campbell

22

23

24 ——————————————————
[26] Hunnicut Report at p. 2; Deposition of Robert Garavello (hereinafter

25 "Garavello Depo") at 36:9-37:21; Logue Depo at 69:21-70:17). Campbell Depo.
1 at 54:17-55:3, 107:15-108:23, 134:17-135:14; 145:10-25; Carney Depo. at

26 130:22-131:5; David Marquez Depo at 146:6-147:2; Hunnicut Report, p.3-4;

27 Merrell Depo. 2 at 32:14-34:15; Logue Depo. at 49:3-12, 50:4-13.
[27] Campbell Depo. 1 at 108:17-109:12.

28 [28] Campbell Depo. 1 at 42:16-43:3, 36:4-11; Garavello Depo. at 125:12-15.

Kaye, Rose & Partners LLP

1  cast from the bow and lost his bait.[29] Campbell cast again into the bait ball.

2  Immediately thereafter, Plaintiff fell on his left side, breaking his left hip.[30]

### F. Post-Incident

Plaintiff alleges that he sustained lost income damages based on alleged loss of business opportunities.[31] Campbell testified that he received an opportunity to invest in a company called TAC and invested funds in it during 2009 and 2010.[32] He contends that he might have invested more money in TAC if he were healthier at the time.[33] Campbell also contends he had an opportunity to invest in a company called PNC Technology in 2010, but declined partly because he did not have the time for it.[34]

Likewise, Campbell invested over $100,000 in a company called IV Med during 2008, but it ran into financial trouble when a company called Hospira breached its contract with IV Med.[35] Mr. Campbell alleges that, had he not been injured, he could have traveled in 2008 or 2009 to the Dominican Republic, where Hospira was located, and resolved the breach of contract issue.[36]

Mr. Campbell claims that due to the accident he was unable to get back into the investing circle until late 2011 when he received his "first real good opportunity" to invest in the Pertino deal.[37] Likewise, Mr. Campbell's good friend and fellow investor, Craig Elliott, testified that from the time after the

---

[29] Campbell Depo. 1 at 70:12-21, 84:3-13; Andy Depo. 1 at 20:8-22; Andy Depo. 2 at 82:9-83:5, 83:14-17.

[30] Campbell Depo. 1 at 70:12-21; Andy Depo. 1 at 20:8-22; Andy Depo. 2 at 82:9-83:5, 83:14-17.

[31] [Plaintiffs' Amended Complaint, ¶ 43; Deposition of Plaintiffs' economist expert, Jeffrey Porter, at 21:15-18].

[32] [Plaintiff's Deposition at 43:21 – 44:1].

[33] Plaintiff's Deposition at 43:13-15.

[34] Plaintiff's Deposition at 34:5-11.

[35] Plaintiff's Deposition at 62:17-21.

[36] Plaintiff's Deposition at 63:11-17.

[37] Plaintiff's Deposition at 22:1-7; Deposition of Jeffrey Porter at 82:11-17.

accident until at least the summer of 2011 Campbell did not take any action to get back into the "deal flow" where potential investment opportunities could be discovered.[38]

Campbell's boat captain of 8-years, Bill Merrell, testified that he saw Mr. Campbell appeared to have fully recovered mentally and physically 3-4 months after the incident. Captain Merrell also testified that Campbell was "one hundred percent" normal in his ability to speak and "sharp, the same guy."[39] Captain Merrell further testified that Campbell was fishing, climbing up the ladder to the flybridge of his 60' Hatteras Sport fishing Yacht and driving the boat, with no mental impairment "at all" and simply "amazing."

As a result of his fall, Mr. Campbell fractured his left hip and underwent corrective surgery on December 10, 2008 in San Diego. Ten days after the fall, on December 18, Mr. Campbell was diagnosed with a sudden acute subdural hematoma on the right side of his head and underwent an emergency craniotomy to stop the bleeding and relieve pressure.

## III. APPLICABLE LAW AND BURDEN OF PROOF

### A. Plaintiffs Cannot Prove That the Foredeck Surface of the ANDALE Was Unreasonably Dangerous or Defective, Nor Can They Prove That Mikelson or Bluewater Had Notice of any Unreasonably Dangerous or Defective Condition.

In order for Plaintiffs to establish their Third Cause of Action for Strict Products Liability – Design Defect, they must prove that (1) the Mikelson and/or Bluewater sold or manufactured the product; (2) the product was unreasonably dangerous or was in a defective condition when it left the Mikelson and/or Bluewater's control; (3) the product was in normal use at the time the injury occurred; and (4) the defect resulted in injury to Plaintiff. *Pan-Alaska Fisheries,*

---

[38] Deposition of Craig Elliott at 108:7 – 109:16.
[39] Deposition of Bill Merrell.

Kaye, Rose & Partners LLP

Kaye, Rose & Partners LLP

1  *Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129 (9th Cir. 1977);

2  Restatement (Second) of Torts, Section 402A.  Likewise, in order for Plaintiffs to

3  establish their Fourth Cause of Action for Strict Products Liability – Failure to

4  Warn, in addition to the above elements Plaintiffs must also prove that (1)

5  Mikelson and/or Bluewater negligently failed to warn of a defect in the design or

6  construction; (2) the existence of the defect was known to Mikelson and/or

7  Bluewater; and (3) Mikelson and/or Bluewater could have, by exercising

8  reasonable diligence, made such warnings available to the user or consumer.

9  *Jones v. Bender Welding & Machine Works, Inc.*, 581 F.2d 1331 (9th Cir. 1978).

10  No matter whether the Court applies the consumer expectation test or the risk-

11  utility test, under either test Plaintiffs cannot establish that the deck of the

12  ANDALE was unreasonably dangerous or defective.  The consumer expectation

13  test provides that a product is defective where "it has failed to perform as safely

14  as its ordinary consumers would expect when used in an intended or reasonably

15  foreseeable manner." *Lucas v. City of Visalia*, 726 F.Supp.2d 1149, 1154 (E.D.

16  Cal. 2010).  The risk-utility test "involves a balancing of the likelihood of harm

17  to be expected from a [product] with a given design and the gravity of harm if it

18  happens against the burden of the precaution which would be effective to avoid

19  the harm." *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479 (2001).

20      Although the marine industry has no established standard for the

21  coefficient of friction with respect to a vessel's deck, the land-based industry

22  standard is 0.5.  (Expert Report of Michael Sampsel at page 3, ¶ 5; Sampsel

23  Depo., Vol. 1, 30:13-19; 36:4 – 41:25).  In this case, the static coefficient of

24  friction on the foredeck of the ANDALE exceeded both the land-based standard

25  and the "elevated" standard that Plaintiff's liability expert, Michael Sampsel,

26  argues should apply to vessels.  (Wiker Expert Report, Conclusions, at 2).  In any

27  event, the coefficient of friction testing performed on the ANDALE's foredeck

28  surface was conducted more than 2 years after the incident, and as such it has

1 questionable reliability as an indicator of the condition of the foredeck surface at
2 the time of the incident.

3      Defendants submit that the testimony of the passengers and crew aboard
4 the ANDALE on the date of the incident and in the days immediately preceding
5 the incident is a more reliable indicator of the condition and suitability of the
6 surface at the relevant time.  Indeed, minutes before his fall Plaintiff walked over
7 the very same area where his fall occurred on the starboard side of the vessel
8 without experiencing any problems.  (Campbell Depo. Vol. 1, 70:12-71:23,
9 74:21-75:9, Exhibit 10.)  Mr. Garavello also fished from the bow on the date of
10 the accident and did not find it slippery. (Garavello Depo., 100:22-25; 101: 5-7)
11 Plaintiff cast from the bow of the ANDALE at least two to three times the week
12 of his accident, including one time approximately half an hour prior to his fall.
13 (Campbell Depo. Vol. 1, 49:7-23, 52:15-23.)  No one in the fishing party
14 complained about the ANDALE or its foredeck surface prior to the incident.
15 (Campbell Depo. Vol. 1: 45:25-46:4, 46:16-18, 47:3-48:25; Andy Marquez
16 Depo: 91:13-15; Garavello: 78:8-79:1; 101: 5-7; Logue: 63:19-64:9; Logue:
17 48:16-49:2; David: 57:20-58:70; 138:3-7)  Likewise, Plaintiff and Mr. Garavello
18 testified that the foredeck was not slippery on the date of the incident, prior to
19 Plaintiff's fall. (Campbell Depo Vol. 1, 53:11-16; Garavello Depo., 101:5-7)

20      In addition, there is ample evidence that the foredeck surface of the
21 ANDALE was not unreasonably slippery or unsuitable as a platform for fishing
22 at the time of the incident.  Mikelson's vessel architect, Tom Fexas, designed the
23 vessel to have a slip resistant surface on the foredeck.  (Sullivan Depo, Vol. 1,
24 151:21 – 152:5)  Bluewater carefully selected the nonskid surface by comparing
25 it to others used in the marine industry, and tested the nonskid surface to ensure
26 it was not slippery.  (Chen Depo, Vol. 1, 61:22 – 62:10; 70:20-25; 89:17-25; Vol.
27 2, 174:13-25)  Moreover, the same nonskid surfaces have been used without
28 incident on Mikelson's vessels since the early 1980s and there are 124 yachts

Kaye, Rose & Partners LLP

with identical nonskid patterns as the ANDALE. (Sullivan Depo., Vol. 1, at 21:8-15; Vol. 2, 141:19 – 142:12)

Prior to the instant lawsuit, no one had ever complained to Mikelson or Bluewater about the nonskid deck surfaces on its vessels, nor had anyone ever complained about being injured due to an alleged problem with the nonskid surface. (Sullivan Depo., Vol. 1, 20:21-17-23; 30:24 – 31:3; 80:2-8) Indeed, Logue owned the ANDALE for four years and no one had ever fallen on vessel, nor had he ever received any complaints about the foredeck surface being inadequate or slippery. (Logue Depo., 18:3-19:5, 48:16-49:17, 165:6-11; Garavello Depo., 74:4-10; David Marquez Depo., 40:12-18, 57:20-58:7, 138:3-7; Andy Marquez Depo., Vol. 2, 91:10-15) Moreover, Plaintiff himself cast from the bow of the ANDALE at least two to three times the week of his accident, including one time approximately half an hour prior to his fall. (Campbell Depo. Vol. 1, 49:7-23, 52:15-23.) No one in the fishing party complained about the ANDALE or its foredeck surface prior to the incident. (Campbell Depo. Vol. 1: 45:25-46:4, 46:16-18, 47:3-48:25; Andy: 91:13-15; Garavello: 78:8-79:1; 101: 5-7; Logue: 63:19-64:9; Logue: 48:16-49:2; David: 57:20-58:70; 138:3-7)

Based on the overwhelming evidence, the deck surface of the ANDALE was not unreasonably dangerous or defective. Under the consumer expectation test, the deck surface performed safely as ordinary sportsfishermen would expect. As discussed above, the same deck surface has been used for over 30 years on at least 124 vessels without any incidents or complaints, and Plaintiff even traversed the subject surface of the ANDALE prior to the accident without any incidents or complaints. Plaintiff's own testimony establishes he did not slip on the deck surface, rather his feet went out "violently" from underneath him based on the movement of the vessel. Thus, the vessel surface indeed performed safely as ordinary sportsfishermen (including Plaintiff) would expect. Under the risk-utility test, the coefficient of friction of the foredeck surface of the ANDALE

Kaye, Rose & Partners LLP

exceeded both the land-based standard and the "elevated" standard as argued by Plaintiff's liability expert. Thus, the deck surface presented a very low likelihood of a slip and fall accident occurring. See *Merrill supra*, 26 Cal. 4th at 479. Such very low likelihood harm does not outweigh the burden for a vessel manufacturer to install a deck surface with a greater coefficient of friction, especially considering that a greater coefficient of friction can become a tripping hazard once it reaches a certain level of coefficient of friction. In any event, Plaintiff has not established that any alleged defect in the foredeck surface was the proximate cause of his fall (and alleged resulting damages) in light of the fact that he admittedly did not slip on the deck and has offered no evidence (expert or otherwise) that any alleged lack of slip resistance could have prevented his fall (or allow him to regain his footing) once his feet were violently pulled toward the bow of the vessel by a forward movement of the vessel.

Finally, Plaintiff's Fourth Cause of Action – Strict Liability – Failure to Warn also fails not only because Plaintiffs cannot prove the elements of strict liability, but also because there is no evidence that Mikelson and/or Bluewater had notice of any unreasonably dangerous condition or defect. Indeed, the same deck surface was used for over 30 years and Defendants did not ever receive any complaints nor were they ever advised of any injuries resulting from an allegedly dangerous condition of the deck surface.

**B.  Plaintiffs grossly overreach on their alleged damages.**

**1.  Past medical expenses**

Plaintiffs allege that Defendants are responsible for the medical expenses associated with Mr. Campbell's hip surgery, head surgery, and all subsequent recovery. It is undisputed that Mr. Campbell's medical care was paid by Medicare, Plaintiff's private insurance, and Mr. Campbell himself. In accordance with the collateral source rule, Defendants will not seek to introduce evidence of the amounts paid for the purpose of attempting to reduce Mr.

Kaye, Rose & Partners LLP

Campbell's collection of the amounts paid but only to establish the reasonable value of those services. *See,* Ninth Circuit Model Jury Instruction 5.2 ("Measures of Types of Damages"). The total amount *actually paid* for Mr. Campbell's medical treatment claimed by Plaintiffs is approximately $170,000. These amounts actually paid for Plaintiff's medical treatment are admissible under the Federal Rules of Evidence and the collateral source rule. The Court has already addressed the resolution of this issue in ruling on the parties' motions in limine, and Defendants do not anticipate that Plaintiff will be able to present any expert testimony demonstrating that the amounts billed represent the reasonable value of the services provided. Simply put, the *paid* amounts represent the reasonable value of Plaintiff's medical treatment.

Should the Court find liability and decide to use a multiplier to calculate general damages based on the past medical expenses, the only number to be used is the *paid* amounts. The billed amounts are "unduly inflated" (per the *Quintero* court) and not representative of the reasonable value of the medical treatment. A California appellate court recently ruled on this issue in *Corenbaum v. Lampkin*, 2013 WL 1801996 (Cal. Ct. App. Apr. 30, 2013). The court held that evidence of any value of past medical services exceeding the amount *paid* was inadmissible on the amount of damages for past medical services. The amount paid was also inadmissible to prove noneconomic damages. In addition, evidence of the full amount billed for past medical services could not support an expert opinion on the reasonable value of future medical services.

### 2. Subdural hematoma

Plaintiffs will be unable to prove that the fall on the ANDALE caused the subdural hematoma that developed almost two weeks after the incident. Andy Marquez, the only eye-witness to Plaintiff's fall, testified in deposition that Plaintiff did not hit his head when he fell on the ANDALE. Plaintiff was examined extensively in Mexico immediately after the incident and in San Diego

Kaye, Rose & Partners LLP

1    the following day. None of the doctors who saw him found that he had hit his

2    head or that he suffered any head trauma, such as bumps or bruises.

3    Ten (10) days later, Plaintiff began to exhibit symptoms of an acute subdural

4    hematoma (active bleeding on the brain). Plaintiff's treating surgeon testified in

5    deposition that the subdural hematoma was "acute" in nature, which he defined

6    as developing within 12 to 24 hours or even less. Defendants' neurologist expert

7    opined that if the active bleeding discovered in surgery had begun at the time of

8    the fall on the ANDALE, it would have been caused the development of

9    symptoms at a much earlier date. Defendants' expert opined that it is speculative

10    to conclude that Plaintiff's incident is casually connected to the development of

11    the subdural hematoma. He explained that the subdural hematoma was most

12    likely related to two anti-coagulant medications (aspirin and Ticlid) that Plaintiff

13    had been taking for several months prior to the incident. Plaintiff was given an

14    additional anti-coagulant in the hospital following his hip surgery, Lovenox, and

15    Defendants' expert found that the minimal prophylactic dose he was received as

16    very unlikely to be the cause of the subdural hematoma.

17        Critically, Plaintiff's treating doctor, Dr. Leary, testified in

18    deposition that he has no opinion as to how the subdural hematoma started.

19    Even if Dr. Leary had an opinion relative to the cause of the subdural

20    hematoma, Defendants submit that it would not be admissible in this case

21    because Plaintiff never provided the Defendants with an expert report (as to

22    causation) from Dr. Leary. Although Plaintiffs may attempt to assert that it is

23    not necessary to provide an expert report from Dr. Leary because he is a treating

24    physician, controlling Ninth Circuit case law provides otherwise. In *Goodman*

25    *v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011), the court

26    held that if the treating physician morphs into an expert providing testimony as

27    to, for example, causation, then the doctor is no longer exempt from Rule

28    26(a)(2)(B)'s written report requirement and must be disclosed as an expert

1  witness and must give a timely written report.  Accordingly, Dr. Leary is not

2  permitted to testify regarding medical causation.  For the same reason, Plaintiffs

3  cannot offer the testimony of Dr. Tonks as to medical causation.  Plaintiffs did

4  not provide an expert report by Dr. Tonks pursuant to Fed.R.Civ.P. 26(a)(2)(B).

5  See *Goodman, supra*, 644 F.3d 817.

6         Where federal maritime law is incomplete and does not preempt regulation

7  on a subject, a federal court may apply state law.  *East River S.S. Co. v.*

8  *TransAmerica DeLeval, Inc.*, 476 U.S. 858 (1986); *Wallis v. Princess Cruises,*

9  *Inc.*, 306 F.3d 827, 841 (9th Cir. 2002) ("when new situations arise that are not

10  directly governed by legislation or admiralty precedent, federal courts may

11  fashion a rule for decision by a variety of methods.  Federal courts may, and

12  often do, look to state statutory law and to precepts of common law which the

13  'borrow' and apply as the federal admiralty rule.").  Based on the factual

14  circumstances of the instant case, there is no controlling federal maritime law

15  authorities regarding the burden of proof for medical causation.  The case of

16  *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109 (1959) applies

17  only to claims by seamen (under the Jones Act and for unseaworthiness) and not

18  to admiralty cases generally.  *Omar v. Sea-Land Service, Inc.*, 813 F.2d 986, 991

19  (9th Cir. 1987) ("Speculative and hypothetical medical testimony is admissible in

20  Jones Act suits [citing Sentilles].");  *Mayhew v. Bell Steamship Co.*, 917 F.2d

21  961, 964 (6th Cir. 1990).  *Sentilles* is also distinguishable because, unlike the

22  instant case where the medical testimony is unanimous, it merely addresses the

23  situation where the medical testimony is not unanimous.  *Webster Offshore Food*

24  *Service, Inc.*, 434 F.2d 1191, 1194 (5th Cir. 1970).  Accordingly, because federal

25  maritime law is incomplete and does not preempt regulation on a subject of

26  medical causation in this case, the Court applies California state law on the

27  subject.

28         California state law provides that expert testimony is necessary and critical

to proof of causation in a personal injury action. "Causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation. *Cottle v. Superior Court*, 3 Cal. App. 4th 1367, 1385 (1992); *Bromme v. Pavvit*, 5 Cal. App. 4th 1487, 1502 (1992) ("The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based [on] competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case.").

As noted above, Plaintiffs do not have an expert neurologist to testify at trial to establish causation between Plaintiff's fall and his subsequent subdural hematoma. Accordingly, Plaintiffs cannot contradict Defendants' expert's medical opinion on the causation issue, nor can they provide competent expert medical evidence necessary to establish that the incident on ANDALE was the proximate cause of the subdural hematoma. In the first instance, Plaintiffs have not proffered any competent medical evidence establishing causation regarding the subdural hematoma. (See Magistrate's Order (Dkt. #120) dated December 13, 2012.)

### 3. Future Medical Care

Defendants' experts concluded that Plaintiff does not require any future medical treatment related to his hip or his head. The parties have stipulated that he was discharged from his doctors' care for his hematoma in January 2010 and his hip in May 2010. Plaintiffs' orthopedic expert opined that he does not need a hip replacement at this time but may in the future. Defendants' orthopedic expert saw no evidence of arthritis or need for a hip replacement, and explained that if it were going to be necessary, evidence would have appeared within the first two years after the incident (i.e., by 2011). Plaintiffs did not retain a neurologic expert. Defendants' neurologic expert and Plaintiff's own treating doctor found that Plaintiff made a full recovery and needed no future treatment. There is no

Kaye, Rose & Partners LLP

evidence to demonstrate any need for future medical care.

### 4. Lost income claim

Plaintiffs make claim to multiple millions of dollars in lost income for Mr. Campbell, a retired engineer whose current income is derived solely from selling previously owned stock – of which he has plenty. Plaintiffs' attempts to paint Mr. Campbell as a "venture capitalist" or "angel investor" are simply not supported by the evidence. The reality is that Plaintiff's income comes from passive investments, specifically the sale of Cisco and Packeteer stocks obtained prior to the incident. Mr. Campbell retired in the mid-1990s (no later than 1996). He acquired the Packeteer shares in 1996. He did not earn a regular paycheck between his retirement and the time of the incident other than board advisory fees.

Mr. Campbell was unable to identify any deals which he lost as a result of either the incident or the subsequent purported convalescence. On the contrary, the evidence demonstrates that Mr. Campbell was physically and mentally able to continue his normal investment activities by March of 2009, when he invested $50,000 in a company called TAC.

Federal maritime law and not California common law applies to Mr. Campbell's claim for diminished capacity earnings. U.S. Const. art VI, cl. 2; *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409-410 (1953); *Southern Pac. Co. v. Jensen*, 244 U.S. 205 (1917); *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986); *Prince v. Thomas*, 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997) (for maritime jurisdiction, claim is determined via general maritime negligence principle, not common law negligence). Mr. Campbell has the burden of proving "that a defendant's alleged unlawful act 'caused the loss for which [Mr. Campbell] seeks to recover damages.'" *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). He will be unable to meet this burden of proof

Kaye, Rose & Partners LLP

Kaye, Rose & Partners LLP

1  and will be unable to show that his earning capacity was diminished from the

2  time of the incident to 2011.  Mr. Campbell's claim for economic damages is too

3  speculative on which to recover. *Matson Plastering Co., Inc. v. Plasterers and*

4  *Shophands Local No. 66*, 852 F.2d 1200 (9th Cir. 1988).  In addition, Mr.

5  Campbell failed to mitigate any economic damages by not actively seeking

6  investment opportunities following the incident.

7                    **5.     Loss of Consortium**

8         The Court has now ruled that on balance the Federal case authorities on

9  the subject favor allowing Mrs. Campbell's claim for loss of consortium.  Even

10  so, Defendants don't believe that the evidence in this case will support any

11  substantial award for loss of consortium.  Mrs. Campbell was sixty-three (63)

12  years old at the time of the incident.  The parties stipulated that Mr. Campbell

13  was discharged from rehabilitation treatment on January 11, 2009, to finish his

14  recovery at home.  The parties also stipulated that Mr. Campbell received daily

15  in-home treatment from a nurse from January 11, 2009 until February 17, 2009.

16  They terminated her services when they no longer required her assistance.  The

17  Campbells at all relevant times have had a live-in gardener and a live-in

18  housekeeper.

19  **IV.   CONCLUSION**

20         Plaintiffs will be unable to support their products liability claims against

21  Mikelson and Bluewater.  The overwhelming evidence establishes that the

22  foredeck surface of the ANDALE was not unreasonably dangerous or defective.

23  The static coefficient of friction on the foredeck of the ANDALE exceeded the

24  standard levels considered safe in the industry.  Mikelson has been selling

25  vessels with an identical foredeck surface since the early 1980s and has not ever

26  received any complaints about the deck surface, nor has it received notice of any

27  injuries due to an alleged defect in the deck surface.  In addition, Plaintiff's own

28  testimony establishes he did not slip on the deck surface, rather his feet went out

**DEFENDANTS MIKELSON YACHTS, INC. AND BLUEWATER YACHT BUILDERS, LTD.'S TRIAL BRIEF**

"violently" from underneath him based on the movement of the vessel.
Plaintiffs' product liability claims have been baseless from the outset, and
accordingly Judgment should be entered in favor of Defendants.

DATED: May 21, 2013                    KAYE, ROSE & PARTNERS, LLP


                                       By: _/s/ Frank C. Brucculeri_____
                                            Frank C. Brucculeri, Esq.
                                            Daniel F. Berberich, Esq.
                                            Attorneys for MIKELSON
                                            YACHTS, INC. and BLUEWATER
                                            YACHT BUILDERS, LTD.